**Karla Faye TUCKER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69327.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 7, 1988.

Rehearing Denied Jan. 11, 1989.

Certiorari Denied June 26, 1989. See 109 S.Ct. 3230.

George McCall Secrest, Jr. (on appeal only), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. & Cathleen C. Herasimchuk & Joe Magliolo, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant was convicted of capital murder pursuant to V.T.C.A. Penal Code § 19.03(a)(2). After the jury answered the two special issues submitted in the affirmative, the trial court assessed her punishment at death. Appellant raises nine points of error, including sufficiency of the evidence.

On the morning of June 13, 1983, Gregory Traver was waiting for his friend and coworker, Jerry Lynn Dean, to pick him up for work. When Dean failed to arrive at the usual time, Traver walked the short distance to Dean's apartment and knocked on the door. Finding it slightly ajar, Traver called out the name of his friend and, receiving no response, he entered the apartment. When he reached Dean's spare bedroom, Traver saw Dean lying on the floor with blood on his head. The body of a young woman lay beside him, a pickax imbedded in her chest. Traver immediately called the police.

While inside Dean's apartment, Traver noticed the motorcycle that Dean had been building was gone. Dean's El Camino pickup was also missing. His stereo and television had been taken down and stacked in front of the cabinet on which they were usually kept.

When police arrived, they found the bodies of Jerry Lynn Dean and Deborah Thornton lying on the mattress and floor of the spare bedroom. There were several boxes of materials stacked in the room along with piles of dirty clothes and garden tools. Both bodies had been stabbed repeatedly with what appeared to be a pickax, which was still in the woman's body. Property missing from the apartment included the dead man's motorcycle, his El Camino, and his wallet. Thornton's wallet was also gone. There was no evidence of a forced entry.

Police had few leads on the killings until about five weeks later, when Doug Garrett called his longtime friend, homicide detec-

tive J.C. Mosier of the Houston Police Department. Mosier met with Doug and his girlfriend, Kari Burrell, the next day. They told Mosier that Doug's brother, Danny Garrett, and Kari's sister, appellant Karla Faye Tucker, had committed the murders. The couple's friend, James Leibrant, had also been present during the killings. After talking to the officers investigating the murders of Dean and Thornton, Doug agreed to have himself wired with a microphone in order to obtain information directly from appellant and Danny. A couple of days later, Doug rode his motorcycle over to Danny and appellant's house on McKean Street in Houston. There, he, appellant and Danny spoke for about one and a half hours about the murders. The conversation was recorded and the tape was admitted in evidence at appellant's trial. That same day, after Doug left the house, and based on the information he had obtained, police arrested appellant, Danny, Ronnie Burrell and James Leibrant.

The following story emerged at the guilt/innocence phase of appellant's trial. On June 12, 1983, appellant, her boyfriend Danny, Kari, Kari's exhusband Ronnie, and James Leibrant, were at appellant's house on McKean Street. For most of the afternoon, they had been "drinking, smoking pot," and "eating pills." That evening, Kari and Ronnie left the house separately and did not return until the next day. Between 2:30 and 4:30 on the morning of June 13, 1983, appellant, Danny and Leibrant decided to go over to Jerry Lynn Dean's apartment to "intimidate" him, collect some money Dean allegedly owed appellant or Garrett and to steal his motorcycle. Danny took his shotgun along in case Dean resisted. There was also some testimony that Danny took some rubber gloves along, though it is not clear whether he actually wore them during the killings. Appellant had been talking about "offing" Dean and taking his motorcycle for quite some time.

Upon arriving at Dean's apartment, appellant and Danny walked to the front door, while Leibrant remained outside. Appellant unlocked the door with a key she had stolen from her friend Shawn, who was Dean's estranged wife. They proceeded to Dean's spare bedroom, where Dean and Deborah Thornton were sleeping. According to Kari, appellant "put a pickax up to Jerry Dean's head and told him not to move, motherfucker, or you're dead." Appellant told her sister that she or Danny "bunted one of them upside the head. I don't know which one," and when Dean began to beg for his life, she "picked" him numerous times. She also told Kari "every time she picked Jerry, that she looked up and she grinned and got a nut and hit him again."

After she and Danny had disposed of Dean, appellant discovered Deborah Thornton in the room, shaking in terror. "They threw—they pushed the girl down, threw her under the sheets, and told her if she wants to live to see daylight, then to be quiet and stay underneath the sheets." Appellant and Danny then began to "pick" Thornton, and when she "begged for them to go ahead and kill her because she couldn't take anymore," then "Danny kicked her upside the chin, and through her back, and buried the ax into her throat, the pickax."

At some point during the killings, Danny went outside to retrieve Leibrant, who had been napping in Danny's Ranchero pickup. When Leibrant entered the apartment, he heard a gurgling noise that "sounded like an aquarium pump that was broken." He then observed appellant standing with one foot on a body, which was covered with a sheet, jerking on the pickax, trying to get it loose. "[S]he finally got the ax out, got it up over her head, turned and looked at me and smiled, and hit the dude again." Stunned by this sight, Leibrant fled the apartment. Dean died of severe trauma to the head and multiple stab wounds.

After disposing of Dean and Thornton, appellant and Danny placed Dean's partially assembled motorcycle in the back of the dead man's El Camino pickup along with some boxes of motorcycle parts they had found in the apartment. Appellant drove the El Camino over to Doug's apartment. There, she related the events of the morning to Doug, describing how she and Dan-

ny had "offed Jerry Dean last night." She said, "Dan hit him with the hammer and I picked him," and "Doug, I come with every stroke" of the pickax. She handed him Dean's wallet, which he threw in the trash after burning its contents. The El Camino was abandoned that same day in a parking lot near the Astrodome. The motorcycle and its parts were stored for awhile in Doug's garage, then in Danny's before Doug decided to throw them into the Brazos River.

Back at the house she shared with Danny and Kari, appellant told her sister how she and Danny had killed Dean and Thornton and that she got a "thrill" while "picking" Dean. Appellant gave Thornton's wallet to Kari as a birthday present, which she threw away in disgust. Later that day, a story about the killings was broadcast on the local news. Appellant and Danny laughed and bragged that they were the "pickax murderers." Kari became frightened for her life and that very day, moved out of the house on McKean and in with Doug, whom she later married.

■ In her sixth point of error, appellant claims the evidence is insufficient to show there was a probability that she would commit criminal acts of violence that would constitute a continuing threat to society. Art. 37.071(b)(2), V.A.C.C.P. She states that she has no prior convictions, that the expert testimony did not establish any sociopathic tendencies, and she posed no danger to anyone while incarcerated. Furthermore, there was mitigating evidence of intoxication not considered by the jury, and appellant was remorseful once she had gotten off drugs. For these reasons, she claims there is insufficient evidence to support the jury's affirmative answer to special issue number two. We cannot agree.

While it is true that appellant had no prior convictions, the testimony presented at the punishment phase showed she had a history of violent behavior. The psychological and psychiatric testimony, though somewhat conflicting, also showed her violent nature. Appellant herself took the stand and testified as to her turbulent past. At age fourteen, she beat up a classmate,

blackening both her eyes. She got in a fight with a man and a woman when she was fifteen, and regularly fought with her exhusband. In all, she claims to have been in "at least three good fights that someone was hurt."

Appellant also stated that she had disliked Dean, and told how she had once attacked him, breaking his glasses, and requiring him to go to the hospital to have the glass removed from his eye. After the killings of Dean and Thornton, appellant bragged to the others about what she had done, and boasted she had received sexual gratification every time she struck Dean with the pickax. Appellant showed no remorse until after she was arrested.

Appellant's sister, Kari, stated that she had heard appellant and Danny talking about killing Leibrant and Ronnie to keep them from talking to anyone about the murders. Appellant herself confirmed this conversation at the punishment phase. Appellant also testified about her plans to go on future escapades with Danny and his friends to raid drug labs, kill the people who worked there and to steal their property. All of this testimony indicates appellant's past violence and a willingness to persist in this type of behavior.

Furthermore, the nature of the killings, the planning involved in their commission, appellant's claims of sexual gratification during the "picking" of Dean and her boastfulness afterwards, tend to "evince a 'most dangerous aberration of character.'" *Cass v. State,* 676 S.W.2d 589, 593 (Tex.Cr. App.1984), citing *King v. State,* 631 S.W.2d 486 (Tex.Cr.App.1982), and *Burns v. State,* 556 S.W.2d 270 (Tex.Cr.App.1977). Accordingly, we cannot say the jury was not justified in believing she would commit criminal acts of violence which would constitute a continuing threat to society. The evidence is sufficient to support the jury's affirmative answer to special issue two. Appellant's seventh point of error is overruled.

■ In her eighth point of error, appellant claims that the evidence is insufficient to establish the offense of capital murder beyond a reasonable doubt because the State failed to prove that Dean was killed

while in the course of a robbery. V.T.C.A. Penal Code, § 19.03(a)(2). We do not agree.

Appellant claims that there was no connection between the killings of Dean and Thornton and the subsequent theft of Dean's property. She suggests that proof of the bad feelings between herself and Dean indicates her sole intent was to kill, and the property was taken as an afterthought. This argument is contrary to the gist of the testimony elicited at appellant's trial. Leibrant stated that he, appellant and Danny went over to Dean's apartment to "collect some money and intimidate the man a little," and also said that they discussed taking Dean's motorcycle and perhaps his stereo and television. Kari testified that appellant had several times expressed an interest in taking Dean's motorcycle because she wanted to use it to build her own.[1] Appellant and Danny did, in fact, appropriate the motorcycle.

When considering whether the evidence is sufficient to support a verdict of guilty, we must view the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found all of the essential elements of the offense beyond a reasonable doubt. *Fierro v. State*, 706 S.W.2d 310, 313 (Tex.Cr.App.1986). In *Banks v. State*, 643 S.W.2d 129 (Tex.Cr.App.1983), we held the evidence to be sufficient to establish that defendant committed the offense of murder in the course of robbery. There, defendant had stated that he had decided to kill the deceased "just for the hell of it" and to steal his car. The defendant there apparently did not form the requisite intent until the time of the killing. In *Fierro*, supra, we held that even though there was neither a prior discussion of robbery nor any evidence that the defendant demanded money or property from the victim before shooting him, his intent to com-

mit robbery may be inferred from actions or conduct. *Id.*, 707 S.W.2d at 313, citing *Banks v. State*, 471 S.W.2d 811, 812 (Tex. Cr.App.1971). In both *Banks* and *Fierro*, the intent to kill was formed contemporaneously to the event, namely the robbery. See also, *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983), and *Mulder v. State*, 707 S.W.2d 908 (Tex.Cr.App.1986).

In the case at bar, the record reflects that appellant formed the intent to kill Dean and steal his property well in advance of the robbery/murder which occurred on July 13, 1983. Therefore, the evidence of robbery is more substantial than that found sufficient under *Banks* and *Fierro*, supra. Here, two witnesses testified that appellant had been an active participant in an ongoing plan to "off" Dean and take his motorcycle. From this testimony, along with the actual theft of the motorcycle, a rational trier of fact would be entitled to conclude beyond a reasonable doubt that appellant committed the murder while in the course of robbery. Appellant's eighth point of error is overruled.

In her final sufficiency ground, appellant contends in her ninth point of error that the evidence is insufficient to support a finding that she had acted deliberately with the reasonable expectation that her conduct would cause the death of Dean. Art. 37.-071(b)(1) V.A.C.C.P. Specifically, she suggests that the evidence shows her conduct, as opposed to that of Danny's, could not have caused the death of Dean beyond a reasonable doubt. This premise is the basis for her argument that the State failed to show she was culpable by virtue of her own actions, and so her conduct was insufficient to establish the intent to kill required by *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). We do not agree.

---

1. At the punishment phase, appellant testified that she, Danny, Shawn, Leibrant and Ronnie had discussed "offing" Dean *and taking his motorcycle.* She told Shawn to go get the key to Dean's apartment so they *could carry out these* plans. When appellant's own counsel asked her who had brought up the subject of killing Dean, she replied, "Danny mentioned something to the affect (sic) that he, *Jerry, might have to be killed when the motorcycle would be taken, if the motorcycle—if we were to steal the motorcycle."* In view of this testimony, appellant cannot complain of insufficient evidence to show she committed murder in the course of robbery. *De-Garmo v. State*, 691 S.W.2d 657, 661 (Tex.Cr. App.1985).

In measuring sufficiency of the evidence to support the jury's affirmative answer to the first special issue, we assay whether a defendant's conduct reflects "a conscious decision—greater than mere will—to cause the death of the victim." *Nichols v. State,* 754 S.W.2d 185, 201 (Tex.Cr.App.1988). When two or more persons are involved in the killing, the law of parties may not be applied to the punishment phase of defendant's trial. *Green v. State,* 682 S.W.2d 271 (Tex.Cr.App.1984). The State may not rely on evidence that another with whom the defendant was acting, did so deliberately, but must focus on the defendant's own culpable conduct to determine whether the murder was committed deliberately and with a reasonable expectation that death would result. *Rector v. State,* 738 S.W.2d 235, 241 (Tex.Cr.App. 1986), citing *Meanes v. State,* 668 S.W.2d 366, 379 (Tex.Cr.App.1983) (Clinton, J., concurring).

However, if the evidence warrants, the jury may be instructed on the law of parties at the conclusion of the guilt/innocence phase. Here, the trial court charged the jury that they could find appellant guilty either as a primary actor, or as a party.[2] If the jury found her guilty as the primary actor, the evidence was sufficient to support a finding of deliberateness. The evidence most favorable to such a finding is indicated by appellant's willing participation in Dean's killing. The record reflects that it was probably appellant's idea to kill Dean and take his motorcycle in order to build her own. She went willingly to his apartment, and once inside, struck him numerous times with the pickax. The medical examiner stated that Dean could have died from *either* the blow to the head, the multiple stab wounds, or both. Thus, the evidence most favorable to the verdict is sufficient to show appellant's conscious decision, "greater than mere will," to engage in conduct that caused the death of Dean. *Nichols,* supra. The jury was therefore justified in finding appellant acted deliberately, as the primary actor in Dean's death.

Alternatively, appellant could have been found guilty as a party if the jury found she intentionally solicited, encouraged, directed, aided, or attempted to aid Danny in his effort to kill Dean in the course of a robbery. *Meanes v. State,* 668 S.W.2d 366, 375 (Tex.Cr.App.1983). In view of the evidence summarized above, the jury would have been justified in finding appellant guilty as a party. Even if appellant did not strike the fatal blow, the record would support a finding that she acted with intent to promote the commission of the offense because she solicited, encouraged, directed, aided, or attempted to aid Danny in killing Dean. See, V.T.C.A. Penal Code, § 7.02(a)(2); *Green,* supra, at 286. The evidence shows that appellant and Danny had been planning to "off" Dean and steal his property for some time prior to the killing. She and Danny went into Dean's apartment together. Danny hit Dean in the head and they both participated in "picking" Dean. We conclude this evidence is sufficient to show appellant acted deliberately and with a reasonable expectation that death would result, in soliciting, encouraging, directing, aiding, or attempting to aid Danny in the intentional murder of Dean.

Having found evidence of deliberateness to be sufficient, we also find that *Enmund v. Florida,* supra, is satisfied. In *Enmund,* supra, the United States Supreme Court held that when two or more persons were involved in the commission of the offense, the death penalty could not be assessed against a defendant "who did not kill, attempt to kill, or intend to kill, or intend to contemplate that life would be taken." *Green,* supra, at 287, citing *Me-*

---

**2.** V.T.C.A. Penal Code, § 7.01(a) provides that a person may be held criminally responsible as a party to an offense if it is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

V.T.C.A. Penal Code § 7.02(a)(2) further provides that a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

*anes*, supra, at 375. The focus must be "on the defendant's culpability, not on those who committed" the offense. *Cuevas v. State*, 742 S.W.2d 331, 351 (Tex.Cr. App.1987). Special issue number one "clearly focuses the jury's attention on the individual defendant by asking if the conduct of the defendant 'was committed deliberately' and with the reasonable expectation that death would result." *Meanes*, supra, at 375. We have previously held that the first special issue includes the required *Enmund* finding. *Cuevas*, supra. Since the jury here answered special issue one affirmatively, the jury also made the required *Enmund* finding.

█ Furthermore, in our view the jury made an adequate finding of an intent to kill in its verdict of guilt, regardless of whether it found appellant guilty as primary actor or as a party to the offense. In a prosecution for capital murder under V.T. C.A. Penal Code, § 19.03(a)(2), in order to convict the accused as a primary actor the State must prove and the jury must find that he "intentionally commit[ted] the murder" in the course of the underlying felony. Unquestionably such a finding satisfies *Enmund*. Moreover, before the accused may be found criminally responsible for the conduct of another who "intentionally commits the murder," under the provisions of V.T.C.A. Penal Code, § 7.02(a)(2), it must be shown the accused harbored a specific "intent to promote or assist the commission of" the intentional murder the other committed. *Meanes v. State*, supra at 375–76; *Rector v. State*, supra at 244; See also *Martinez v. State*, 763 S.W.2d 413, 420 n. 5 (Tex.Cr.App., 1988). One could hardly indulge an intent to promote or assist in the commission of an intentional murder without, at a minimum, intending or contemplating that lethal force would be used. In short, that the jury may not have believed appellant actually inflicted the blow which killed Dean is of no moment. Because it was required to find an intent to promote or assist commission of *an intentional murder* before the jury could convict appellant as a party to the offense in the first instance, we cannot say the jury

failed to make the required *Enmund* finding. Appellant's ninth point of error is overruled.

In her first two points of error, appellant asserts that the trial court committed reversible error by refusing to allow her to offer the testimony of Donna Wages in the presence of the jury to show bias on behalf of State's witness James Leibrant. Appellant sought to show the State had agreed to recommend a lenient sentence in return for Leibrant's testimony.

The record reflects that Leibrant, an eyewitness to part of the murders, was questioned on crossexamination about a "deal" for leniency between himself and the District Attorney's Office. Leibrant denied the existence of any such arrangement, conceding only that it had been agreed if he testified, that fact would be made known to the court at his own trial.

Appellant then attempted to offer the testimony of Wages in order to show there did in fact exist an agreement for leniency in exchange for Leibrant's cooperation. Outside the presence of the jury, Wages testified that as a bystander she had overheard Assistant District Attorney Charlie Davidson and another man, who was never identified, discussing the appellant's case. Wages stated that, although appellant's name was never mentioned, she began to pay attention to the conversation when the two referred to the "pickax murders." They mentioned "the girl" and a person named Jimmy, who had been offered "a single digit number" in return for his testimony. Reference was also made to a tape, wherein someone was "talking about reaching a climax every time, you know, this happened." Wages, who was charged with theft, knew appellant through various programs and clubs at the Harris County Jail. The court sustained the State's objection to Wages' proffered testimony on hearsay grounds.

Upon request of appellant, the court called Davidson to the stand. The court questioned him extensively as to the alleged agreement. Davidson confirmed Leibrant's statement that the only "agree-

ment" was that "if he would testify, ... truthfully as we understood it, that we would make the judge presiding over his cases aware of his testimony ... at the time his cases came up. We have not made any kind of affirmative deals or bargains with him as far as punishment...."

Davidson testified further that he knew who Wages was, but recalled no conversation he ever had in her presence. He did not remember having a discussion with anyone fitting the description given by Wages. Neither did he make Leibrant an offer of a single digit number, specifically between six and nine years in return for this testimony.[3]

The defense then questioned Davidson. His testimony was essentially the same as that elicited by the court. He said that he had approached Leibrant about testifying against appellant. Again, he emphatically denied any deal or bargain with Leibrant for his testimony, but stated that it was always the State's intention to "advise the judge of his cooperation and allow the judge to be the one to assess whatever punishment he felt proper in his cases."

The court then briefly questioned Leibrant's attorney, John Whitmire, who acknowledged that he did not fit Wages' description of the man she saw talking to Davidson. Whitmire, who was present when Davidson testified, stated that Davidson, to his knowledge, had made no misrepresentations during the course of his testimony. He also stated that he had not entered into any agreement with the State on Leibrant's behalf.

Appellant then reoffered Wages' testimony, seeking to introduce it in the presence of the jury and the court again refused her proffer. Appellant argues that the court's refusal of Wages' proffered testimony denied her right of confrontation and this denial in turn was a violation of due process.

■ The right of an accused to confront witnesses against him is guaranteed in both the United States and Texas Constitu-

tions. U.S. Const. amend. VI; Tex. Const. Ann., Article I, § 10. The United States Supreme Court has consistently upheld this right, characterizing its main purpose as allowing the defendant the opportunity to cross examine, not merely to physically confront witnesses who testify against him. *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986), citing *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). The witness' motivation in testifying is of particular relevance. However, the trial court retains wide latitude to impose reasonable limits on such cross examination without violating the Confrontation Clause. *Van Arsdall,* supra, U.S. at 679, S.Ct. at 1435, L.Ed.2d at 683. "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* citing *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985). Cf. *United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

We have previously held that the accused should be given great latitude to show a witness' bias or motive to testify falsely. *Carmona v. State,* 698 S.W.2d 100, 104 (Tex.Cr.App.1985); *Chvojka v. State,* 582 S.W.2d 828, 831 (Tex.Cr.App.1979). The trial court may properly limit cross examination to exclude certain matters, however, provided the defendant has been otherwise afforded a thorough and effective cross. *Carmona,* supra. Trial courts have wide discretion as to how and when bias may be proved and to decide what evidence is material for that purpose. *Chvojka,* supra.

These "wide latitude" cases cited above stand for the proposition that trial courts decide whether or not proffered evidence is actually relevant to show bias, motive, etc., on the part of a witness. However, this is not to say that obviously relevant evidence is admissible even if it suffers from some other evidentiary shortcoming, such as being objectionable as hearsay. Cf. *Green v.*

---

**3.** Leibrant had previously testified that Ronnie Burrell told him that he might get as little as five years if he testified for the State. Of course, Burrell was not an agent of the State.

*State*, 566 S.W.2d 578 (Tex.Cr.App.1978) (hearsay offered to show presence of conspiracy against defendant held inadmissible to impeach police officers); *Taylor v. State*, 160 Tex.Cr.R. 124, 267 S.W.2d 828 (1954) (statement by defendant's son that his father told him to get in backseat because he was interfering with driving held not admissible for impeachment of defendant in prosecution for driving while intoxicated, where son did not testify); *Adams v. State*, 7 S.W.2d 528, 529 (Tex.Cr.App.1928) (letter to district attorney from first wife claiming defendant had wrecked her life held inadmissible to impeach her where she had testified favorably for defendant in bigamy prosecution). Here, appellant is claiming she is entitled to prove the fact that a deal was made and offered to Leibrant. However, the only substantive evidence of any such deal constituted hearsay, a third party assertion admitted for the truth of the matter asserted.

■ Appellant complains that because she was forced to attempt to admit hearsay as substantive evidence, she was caught between Scylla and Charybdis. The only other way for her to have utilized Wages' testimony would have been to call Davidson, elicit his statement denying the "deal," and then use it as a "prior inconsistent statement" to impeach Davidson. This procedure would not have involved substantive use of the out of court statement. However, appellant rightly points out that she could not have done so under this Court's construction of Article 38.28, V.A.C.C.P. In *Pitts v. State*, 758 S.W.2d 757 (Tex.Cr. App.1988, rehearing denied, Oct. 10, 1988), we reiterated the two part test which must be met before a party was allowed to impeach his own witness under our former rule. Not only must he show the testimony surprised him, but he must also show that the witness testified to facts "injurious" to his case. *Pitts*, supra, at 758–59. Clearly appellant could not have met this standard.

Although she nowhere cites it in her brief, appellant's situation is reminiscent of the defendant's predicament in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038,

35 L.Ed.2d 297 (1973). There the Supreme Court found that the Mississippi common law "voucher" rule, operating in tandem with an inflexible application of the hearsay rule, effectively deprived Chambers of due process of law. Under Mississippi's "voucher" rule, Chambers was prevented from impeaching one McDonald, a witness he himself had called to the stand. Thus, he was unable either to crossexamine a witness whose testimony was damaging to his case, or present witnesses in his own behalf who would have discredited that witness. He was denied the opportunity to test McDonald's recollection, probe into the details of his alibi, or to "sift" his conscience so the jury might determine whether his testimony was worthy of belief. *Id.*, 410 U.S. at 294–95, 93 S.Ct. at 1045–46, 35 L.Ed.2d at 308–09.

However, the Supreme Court's rationale did not rest solely upon operation of the "voucher" rule. The trial court also refused to allow Chambers to introduce the testimony of three witnesses on the grounds their testimony constituted hearsay. Each would have testified to a separate statement purportedly made by McDonald shortly after the crime had been committed, naming himself as the murderer. These statements were in the nature of confessions, were made shortly after the commission of the offense, were corroborated by other evidence in the case, and were clearly against McDonald's penal interest. McDonald was present in the courtroom, under oath and subject to cross examination. Under these circumstances the Supreme Court found the testimony to possess substantial indicia of reliability, and held that to refuse to bend the hearsay rule constituted a violation of due process in the premises. "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*, 410 U.S. at 302, 93 S.Ct. at 1049, 35 L.Ed.2d at 313.

■ The present case is distinguishable. Standing alone, uncorroborated by any other evidence, Wages' testimony lacked any indicia of reliability whatsoever.

Under these circumstances we cannot agree that application of our own "voucher" rule justified admission of hearsay evidence. Appellant does not assail constitutionality of Article 38.28, supra, *per se.* Had appellant here actually called Davidson to the stand, tried unsuccessfully to impeach him with the testimony of Wages, and *then* attempted to argue confrontation defects with this Court's construction of Article 38.28, we may have been inclined to decide whether application of our version of the "voucher" rule in and of itself deprived appellant of a fair trial. However, whatever constitutional defects may be inherent in Article 38.28, supra, preventing use of Wages' testimony to impeach Davidson, that does not justify substantive use of her testimony when none of the indicia of reliability such as those identified in *Chambers* is present here. We overrule appellant's first two points of error.

In her third point of error, appellant contends that the submission of an instruction on V.T.C.A. Penal Code, § 8.04 during the penalty phase was unconstitutional because it required the jury to find that appellant's voluntary intoxication rose to the level of temporary insanity before it could consider her drug use on the night of the offense as a factor in mitigation of her punishment. Because the jury could not consider the mitigating evidence of intoxication in any other light, appellant argues, the inclusion of this charge establishes egregious harm.

■ While our penal code specifically precludes voluntary intoxication as a defense to the commission of crime, mitigation of punishment is possible, but only where the level of intoxication produces temporary insanity in the defendant. *Cordova v. State,* 733 S.W.2d 175, 189 (Tex.Cr. App.1987); *Sawyers v. State,* 724 S.W.2d 24 (Tex.Cr.App.1986). See also, G. Reamey, CRIMINAL OFFENSES AND DEFENSES IN TEXAS, 216 (1987). A defendant must be able to show his intoxication produced temporary insanity in order to be entitled to a charge that such insanity may mitigate his punishment. *Reamey,* supra.

Here, appellant offered extensive evidence of chronic drug abuse extending over a long period of time. Through her own and expert testimony at punishment, the jury learned that she began to use marihuana at the age of eight and was already using heroin intravenously by age ten. She continued to use drugs, both legal and illegal, up until the time she was arrested for the murder of Dean. Her use of drugs was so extensive that one expert stated she had probably been off drugs for only two weeks out of her entire life. During the two days before the killings, appellant had been taking Valium, Placidyl, Percodan, Soma, Wygesic, Dilaudid, and methamphetamine. In her own words, appellant was "wired."

At the close of the penalty phase, appellant submitted a charge in writing, specifically requesting an instruction on § 8.04. The court first charged the jury that they could take into consideration all evidence submitted at the guilt/innocence phase as well as that adduced at punishment. The court then charged the jury pursuant to § 8.04, supra, as follows:

> Evidence of temporary insanity of the defendant caused by intoxication may be introduced by the defendant in mitigation of the penalty attached to the offense for which she is being tried.

> Intoxication means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

> Temporary insanity caused by intoxication means that the defendant's mental capacity was so disturbed from the introduction of a substance into her body that the defendant did not know that her conduct was wrong or was incapable of conforming her conduct to the requirements of the law she allegedly violated.

> Therefore, if you find, or have a reasonable doubt thereof, that the defendant at the time of the commission of the offense for which she is on trial, was laboring under temporary insanity caused by intoxication, then you may take such condition into consideration in mitigation of the penalty attached to the offense for which the defendant is being tried.

Appellant argues the above charge allowed the jury to consider her drug use and intoxication on the date of the killings as mitigation of punishment *only* if they first found her voluntary intoxication rose to the level of temporary insanity. This limitation impermissibly limited the mitigating significance the jury could have given it. In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held the penalty of death to be qualitatively different from any other sentence. "[T]his qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Id.*, 438 U.S. at 604, 98 S.Ct. at 2964, 57 L.Ed.2d at 989. "[A] statute that prevents the sentencer ... from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is incompatible with the commands of the Eighth and Fourteenth Amendments." *Id.*

■ Although appellant was not prevented from introducing mitigating evidence, the above instruction required the jury to find her intoxication at the time of the killings rendered her temporarily insane before they could consider her drug use in mitigation of her punishment. The charge on its face instructed the jury to consider the mitigating evidence only in this light, thereby implying that it may not have been considered for any other purpose.[4] Appellant maintains she is entitled to whatever mitigating significance the jury might choose to give the fact of her intoxication, irrespective of whether it rose to the level of temporary insanity. However, we need not reach the merits of her contention.

■ The record reflects that appellant insisted upon the charge on § 8.04, and the court submitted her instruction exactly as

she had requested it. It is well established that when a defendant requests a charge, and the court submits it, he can not complain of that charge on appeal. *Plante v. State*, 692 S.W.2d 487 (Tex.Cr.App.1985); *Gutierrez v. State*, 659 S.W.2d 423 (Tex.Cr.App.1983). Even if the charge is later found to be erroneous, the accused can not first invite error and then complain about it on appeal. *Cadd v. State*, 587 S.W.2d 736 (Tex.Cr.App.1979); *Livingston v. State*, 739 S.W.2d 311 (Tex.Cr.App.1987). Because appellant's charge on voluntary intoxication was submitted precisely as she had requested, any error was invited. Appellant's third point of error is overruled.

In her fourth point of error, appellant claims the trial court erred by admitting into evidence the tape recorded conversation between herself, Danny Garrett and Danny's brother, Doug. Appellant complains that since Danny refused to testify at her trial, his statements should either have been deleted or redacted. The trial court's failure to do so, she asserts, placed before the jury incriminating statements by appellant's codefendant, implicating her while depriving her of any opportunity to confront or crossexamine him.

As we stated previously, a defendant's right to confront and crossexamine the witnesses against him is fundamental to a fair trial. Nowhere is this right more crucial than where incriminating extrajudicial statements of codefendants are used against each other at trial. "Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand.... The unreliability of such evidence is intolerably compounded when the alleged accomplice ... does not testify and cannot be tested by cross-examination. It was against such threats that the Confrontation Clause was directed." *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The right to confront and crossexamine witnesses promotes reliability in criminal

---

**4.** While the trial court may not have needed to give *any* charge, *Arnold v. State*, 742 S.W.2d 10, 14 (Tex.Cr.App.1987); *Cordova v. State*, 733

S.W.2d 175, 190 (Tex.Cr.App.1987), it could *not* give an improperly limiting one (if such was in fact what was given).

trials. *Lee v. Illinois*, 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514, 526 (1987). "[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213, 227 (1970), citing *California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489, 499 (1970). This truthfinding function of the Confrontation Clause is threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of crossexamination. Especially suspect are the post arrest statements of a codefendant. "'Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.'" *Lee v. Illinois*, supra, citing *Bruton v. United States*, supra, 391 U.S. at 141, 88 S.Ct. at 1631, 20 L.Ed.2d at 476.

In *Lee v. Illinois*, supra, the defendant gave a statement to police in which she confessed to the murders of her Aunt Beedie and Odessa Harris. Her boyfriend, Thomas, at first refused to talk to police, but later confessed after prompting by defendant. Thomas' version of the killings indicated that he and the defendant had planned the murder of her aunt, contrary to defendant's account. The trial court relied heavily upon Thomas' confession at the couple's joint trial to rebut defendant's theories of sudden passion and self-defense. Since Thomas had invoked his Fifth Amendment right to remain silent at trial,

defendant was unable to crossexamine him. The Supreme Court held that the trial court's reliance on Thomas' confession as substantive evidence violated her rights under the Confrontation Clause. Thomas' confession, although "interlocking" somewhat with defendant's, was presumptively unreliable, and did not bear sufficient indicia of reliability to overcome that presumption.

Appellant here appears to be arguing that the tape was hearsay and did not come within the coconspirator's exception; *ergo*, its admission violated her confrontation rights. We find this argument to be misplaced, as hearsay and confrontation are not necessarily coextensive. The Supreme Court has held that the constitutional right to confrontation does not require that hearsay evidence can *never* be introduced. See *Dutton v. Evans*, 400 U.S. 74, 80, 91 S.Ct. 210, 215, 27 L.Ed.2d 213, 222 (1970), and cases cited therein. "[E]ven if certain hearsay evidence does not fall within a 'firmly rooted hearsay exception' and is thus presumptively unreliable and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by a 'showing of particularized guarantees of trustworthiness.'" *Lee v. Illinois*, supra, 476 U.S. at 543, 106 S.Ct. at 2064, 90 L.Ed.2d at 528, citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, (1980).

The State urges that defendant's statements on the tape were admissible as adoptive admissions.[5] We find this argument to be persuasive. Adoptive admissions have been recognized for years by the federal courts and are not hearsay under their rules.[6] Unlike the defendant in

---

5. The State refers to this exception as the "Crestfield Doctrine." In *Crestfield v. State*, 471 S.W.2d 50 (1971), we held that "[w]here a statement or remark is made in defendant's presence, which he understood and which called for a reply, his silence or acquiescence may be shown as a confession where he was not under arrest." *Id.* at 53. This rule has now been codified as R. 801(e)(2)(B), Tex.R.Crim.Evid., and provides that a statement is not hearsay if it is offered against a party and is a statement of which he has manifested his adoption or belief in the truth.

6. Where the trial court admits a recording containing "reciprocal and integrated utterance[s]" between two parties, which were adopted by the defendant, the Confrontation Clause will not be violated. *United States v. Lemonakis*, 485 F.2d 941, (D.C.Cir.1973). The trial judge should hear the recordings outside the presence of the jury in order to rule on objections to their admissibility, and has the power to delete objectionable portions if necessary. *Id.* at 949. See also, *United States v. Smith*, 600 F.2d 149, 152 (8th Cir.1979) (tape recordings of coconspirators

*Lee v. Illinois,* supra, appellant was present at all times during the conversation, and she did not contradict Danny's statements. Under this theory, appellant, because she acquiesced to statements which would otherwise have called for a response, adopted Danny's admissions as her own. Because the statements were not the product of custodial interrogation, Danny lacked any desire, motive or impulse to distort the facts to appellant's detriment, one of the evils inhering in the codefendant's statement in *Lee,* which rendered it unreliable. For the same reasons underlying the hearsay exception, we find appellant's presence and acquiescence in Danny's statements to be a sufficient guarantor of reliability as to obviate any possible confrontation problem.[7] Thus, Danny's statements need not have been redacted or deleted.[8] Appellant's "adoptive admission" of Danny's statements was sufficiently reliable so as to enable the jury satisfactorily to evaluate its truthfulness. Accordingly,

we overrule appellant's fourth point of error.

In her final two points of error, appellant contends that the trial court erred by refusing to define "deliberately" at the punishment phase, and that special issue one is unconstitutional because it duplicates a necessary element of the crime. Appellant argues in her fifth point that "deliberately" means something other than intentional conduct, and therefore requires the term be defined by the court in its charge on punishment. Paradoxically, she then asserts in her sixth point that the legislature intended the term "deliberate" to be synonymous with the culpable mental state for murder, namely intentionally and knowingly; *ergo,* special issue one fails to narrow the class of persons eligible for imposition of the death penalty compared to others convicted of murder.

■ Addressing the former contention, we observe that this Court has repeatedly held the trial court need not define "deliberately" in its charge at the penalty phase

made in presence of defendant held admissible as adoptive admissions); *United States v. Kenny,* 645 F.2d 1323, 1340 (9th Cir.), cert. denied, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981) (statements by government informant on tape recorded telephone conversation held to have been adopted by defendant under rule of adoptive admissions); *United States v. Murray,* 618 F.2d 892, 900 (2nd Cir.1980) (government informant's statements on tape held to be part of "reciprocal and integrated" conversation with defendant, and as such did not violate Confrontation Clause).

7. We need not determine whether the appellant's statements came within the coconspirator's exception to the hearsay rules, as they were otherwise admissible as adoptive admissions. Admission of the tape did not distort the truth finding process if it possessed sufficient indicia of reliability. Compare the reliability of the statements contained on the tape with the testimony of Donna Wages, in points of error one and two, supra. We found her statement lacked any indicia of reliability because it was hearsay and totally uncorroborated by any other evidence. This case is easily distinguishable from *Lee v. Illinois.* The tape was made shortly before the arrest of appellant and Danny, at the couple's home, so the statements were not the product of custodial interrogation. Thus, Danny had no reason to give a statement inculpating the appellant and exculpating himself because they were not made *after* the arrest. The

evil in *Lee v. Illinois,* supra, was that Thomas, because his confession was obtained only after the defendant had implicated him in the murders, would have a motive to distort the truth in order to mitigate his own culpability or to overstate her involvement. Here, neither a motive to inculpate appellant nor to seek retaliation for implicating her codefendant is present. Appellant was with Danny at all times, and had ample opportunity to rebut or deny any statements he might have made. Because there was no distortion of the truth finding process, there were sufficient indicia of reliability to rebut the presumption of unreliability. Where there is a high degree of reliability, the accuracy of the truth determining process in criminal trials is actually advanced, and there is no violation of the Confrontation Clause. See *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 1127, 89 L.Ed.2d 390 (1987).

8. The trial court, during appellant's motion to suppress, seemed to accept the adoptive admissions theory. The judge stated, "There's an admission against penal interest that was made outside of this Courtroom that was not the result of custodial interrogation. If this had been simply a tape recording of Mr. Garrett confessing and implicating Karla Tucker, there's no question that would be suppressed. However, you have an additional factor of two co-conspirators, *or of two co-defendants, in the presence of one another, both making inculpatory statements to a third party."* (Emphasis added)

of a capital murder trial. *Russell v. State*, 665 S.W.2d 771, 780 (Tex.Cr.App.1983). Because that term is not statutorily defined, it "is to be understood in its usual acceptation in common language...." See e.g., *Rector v. State*, 738 S.W.2d 235, 244 (Tex.Cr.App.1987).[9]

As for appellant's final claim, we have previously held that "deliberate" and "intentional" have different meanings for the purposes of our capital sentencing scheme. In *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981), we opined that if "deliberately and intentionally and knowingly were linguistic equivalents, ... Art. 37.071(b)(1), ... would be a useless thing in that a finding of an intentional or knowing murder would be irreconcilable with a finding that the defendant's conduct was not committed deliberately. We will presume that the Legislature would not have enacted Art. 37.071(b)(1), ... had it intended for a finding of deliberateness to be based upon the same standard as that of intentional or knowing." *Id.* at 552–53. See also *Felder v. State*, 758 S.W.2d 760 (Tex. Cr.App.1988), and cases cited, at 769. Appellant's fifth and sixth points of error are overruled.

The judgment is affirmed.

TEAGUE, J., dissents.

---

**9.** This writer adheres to his dissenting opinions in *Russell v. State,* supra, at 784, and *Morin v. State,* 682 S.W.2d 265, 270 (Tex.Cr.App.1984), as well as Judge Duncan's concurring opinion in *Lane v. State,* 743 S.W.2d 617, 631 (Tex.Cr.App. 1987).