COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| ALEXANDER HOLLAND, | § | No.08-19-00249-CR |
| | | |
| Appellant, | § | Appeal from the |
| | | |
| v. | § | 299th District Court |
| | | |
| THE STATE OF TEXAS, | § | of Travis County, Texas |
| | | |
| Appellee. | § | (TC# D-1-DC-19-904012) |

## **O P I N I O N**

Appellant, Alexander Holland, appeals from his conviction for murder and from his sentence of 55 years confinement in the Institutional Division of the Texas Department of Criminal Justice. *See* TEX.PENAL CODE ANN. § 19.02; *Id.* § 12.32. In a single issue, he argues that the trial court erred by including an instruction on the law of parties in the charge of the court, thereby reducing the burden of proof on the State. We find no merit to Holland's issue and affirm the judgment.[1]

## **BACKGROUND**

In January of 2017, Jason Baros and his girlfriend Luz Angel Munoz were living in a

---

[1] As this case was transferred from our sister court in the Third Court of Appeals of Texas, we decide it in accordance with the precedent of that court. TEX.R.APP.P. 41.3.

"homeless camp" behind a closed Jack in the Box restaurant on East Riverside in Austin, Texas.[2] Baros met Holland through his girlfriend in October of 2016 and saw him regularly because Munoz worked as a "chauffeur" for Holland. In the days leading up to the murder of Munoz on January 18, she and Holland had multiple arguments over a cell phone Holland had given her to use. Two days before Munoz was beaten, Holland came to the campsite she shared with Baros looking for the phone. Munoz was not there but Holland told Baros he needed the cell phone back. Baros testified that at the time Holland "didn't seem very mad." The next day, Holland returned to the campsite to find Munoz and Baros laying down because Munoz was sick. He began yelling at Munoz that she needed to return the cell phone to him. Munoz yelled back that she had given the phone to a person named JG. Baros described Holland as very angry at this point. Holland picked up a drawer that was on the street and threw it at Munoz's head, but Baros was able to block it.[3] Baros jumped up as Holland pulled a knife. Baros grabbed a nearby wine bottle. Baros detailed the resulting stand-off between the two. Holland said that he wanted his cell phone back, that he was not playing anymore and that he was "going to beat the shit out of [Munoz]." Holland then left.

The next morning, Baros encountered Holland walking on the street a few blocks from the campsite. Baros testified that Holland was "calm" during their conversation and that Holland expressed to him that "[e]verything's okay." He also told Baros that he just wanted his cell phone back and that he had talked to JG who told him that he did not have Holland's cell phone. The two then parted ways. Around 10:00 p.m. that same night, Holland arrived at Baros and Munoz's

---

[2] A Marisco's Grill also occupied the location before it was abandoned and became an area used by the homeless. Multiple witnesses referred to the location by that reference as well.

[3] Furniture had been removed from a nearby building that was being remodeled and placed on the street near the homeless campsite.

campsite in an SUV. Holland exited the vehicle from the passenger side, came to where the two were laying on their bed and began yelling at Munoz that he was "going to kick her ass because she didn't return his cell phone." Baros characterized Holland as "more angry than I had ever seen him before."

Munoz stood up as she and Holland argued and Baros recounted how he positioned himself between the two because he was afraid Holland would attack Munoz. Baros put his hands behind his back and told Holland to hit him and not Munoz. Holland was the first to take the argument to a physical fight by pushing Baros. The driver of the SUV then asked Holland if he needed the pistol to which he replied "No." The driver got out of the vehicle and ran towards Baros to join Holland in attacking him. While the driver grabbed Baros, Holland hit him. Holland then turned his anger on Munoz and Baros continued fighting the driver. Baros could only hear what was happening between Holland and Munoz, so at a point, he left the driver on the ground to retrieve Munoz in hopes of walking away from the situation. As they were walking, Holland joined them and punched Baros in the face. Baros was dazed by the punch when the driver ran at him again and the two began to wrestle on the ground. Baros could only see Munoz and Holland out of the corner of his eye during the struggle but did see Holland punch Munoz in the face causing her to fall to the ground. Holland then kicked Munoz in the face and stomped on her head. Each time Munoz would try to rise, Holland would stomp on her head causing her head to impact the concrete. Baros estimated this happened four times. When Baros saw this happening, he disengaged from the driver and went to help Munoz. When he did, the driver came to where Munoz was and kicked her. Holland and the driver then ran to the SUV where Holland got in the driver's seat and the other man got in the passenger's seat. When Baros got to Munoz, she was non-

responsive and had blood coming from her nose and mouth. Baros held Munoz so they were on their knees as the SUV was driven towards them. When the SUV hit the two of them, Munoz's head snapped back and Baros was struck in the shoulder and face. After striking Baros and Munoz, Holland had to stop the vehicle and back up to be able to take the exit to the street. Baros yelled for help as a car pulled up and the police arrived quickly. Ambulances took Munoz and Baros to the hospital.[4]

About 9:00 p.m. on this same night, Desiree Otero was driving home from work. She lived right off Riverside. As she was driving and talking to a friend on the phone, she observed two people beating up another person. She told her friend she thought a homeless person was being attacked. Otero testified, that although it was nighttime, she could see because she turned on her bright lights and the area was well-lit due to the traffic and the lights of the surrounding businesses. Otero described "that two people were initially holding up one person and kind of taking turns taking blows, like hits at the other person." She described how the person being hit was eventually dropped to the ground and how the other two started kicking and stomping on the person on the ground in the area of that person's head. When asked to rank the force of the stomps and kicks on a scale of one to ten with ten "being as much force as you can imagine someone applying," she answered it was "[d]efinitely a ten." Otero explained she started flashing her bright lights and honking her horn to try to stop the attack. Her intent was to turn into the area, but she could not enter at the point she tried. Otero had to circle back around, yet she continued to honk and flash her lights. As she pulled into the area where the assault was occurring, the two individuals were still kicking and stomping on the person on the ground, but when she got closer, they took off

---

[4] Upon examination and a CAT scan at the hospital, it was revealed that Baros suffered several facial fractures.

running towards a vehicle. She remembered one of the individuals had on gray and orange clothing. Otero saw the two individuals leaving in the vehicle. She could then tell they were two African-American males and that the driver was wearing an orange and gray hoodie. Otero was able to identify Holland in court as the driver of the vehicle she saw in the parking lot that night.

After Otero entered the parking lot, a person came up and started beating on the side of her car and window. He asked her to call for help because his "girlfriend had just [been] jumped . . . ." At that same time, Otero saw a police officer driving by, so she flashed her lights and honked her horn to get his attention. When Otero could tell the officer was coming to the lot, she got out of her car and used the flashlight on her phone to locate the injured person. She found Munoz laying on the ground in a fetal position covered in blood. Otero testified that "there was blood all over her head, her nose. She was just lying in blood."

When the paramedics arrived on the scene, they found Munoz on the ground in what was described as "decerebrate posturing." It was explained that this occurs when an individual has such severe brain injury that the "likelihood of survival is very, very low." Dr. Vincent Wang, a neurosurgeon, performed brain surgery on Munoz beginning approximately thirty minutes after her arrival at the hospital. After performing the operation, Dr. Wang opined that Munoz's chance of survival was "virtually zero" due to the blunt force trauma she had endured. Dr. Wang testified that the force necessary to cause the type of brain injury Munoz sustained would have to be "high-energy" and he would not expect to see this from simply falling down. Although he acknowledged he did not know how many impacts there were, he did believe the brain trauma could have been caused by kicking her in the head, stomping on her head or both. Munoz died on January 20. Dr. Vickie Willoughby, a Deputy Medical Examiner for the Travis County Medical Examiner's

5

Office expressed a similar opinion that, based on the findings in the autopsy, multiple impacts of blunt force trauma caused the brain injury that resulted in the death of Munoz.

Holland was arrested and being transported to the police station at about the same time as Munoz passed away. When he arrived at the station, officers observed a stain on Holland's right shoe that they believed could possibly be blood. Holland's clothes and shoes were collected as evidence. The items were submitted to a laboratory where a forensic scientist performed testing for DNA. The lab was furnished a blood standard from Munoz and buccal swabs containing DNA from Holland. The DNA profile showed the blood stain on the right shoe contained a mixture of at least two individuals with a major female DNA profile which matched the profile of Munoz.[5]

## DISCUSSION

In his sole issue, Holland contends the trial erred by including an instruction on the law of parties in the court's charge which he argues reduces the State's burden of proof. During the charge conference at the end of the guilt-innocence phase of trial, Holland's counsel addressed the disputed instruction by stating "I would object to the inclusion of the law of parties in this case and the language specifically used on page 2 of the charge." Counsel stated no basis in law for his objection — indeed he never mentioned that the inclusion of the instruction reduced the State's burden of proof. After a final review of the court's charge, Holland's counsel "reurge[d] [his] objection to the inclusion of the law of parties in the charge." He then simply read into the record the following instructions which appeared on page two of the charge:

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is

---

[5] The medical and scientific evidence is lengthy and detailed. Given the single issue raised by Holland, we will dispense with further discussion of those facts which are not necessary to resolve the issue raised.

6

criminally responsible, or by both. Each party to an offense may be charged with the commission of the offense.

A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

*See* TEX.PENAL CODE ANN. § 7.02(a)(2). Once again, he simply objected to inclusion of the language in the charge and never mentioned his argument on appeal.

To preserve error regarding a jury charge, an objection must be sufficiently specific to point out the errors complained of. *Chapman v. State*, 921 S.W.2d 694, 695 (Tex.Crim.App. 1996); *Harkins v. State*, 268 S.W.3d 740, 746 (Tex.App.—Fort Worth 2008, pet. ref'd) *see also* TEX.CODE CRIM.PROC.ANN. art. 36.14 ("Before said charge is read to the jury, the defendant or his counsel shall have a reasonable time to examine the same and he shall present his objections thereto in writing, *distinctly specifying each ground of objection*." [Emphasis added]). "To constitute a valid objection to jury instructions, the objection must be specific and clear enough to apprise the trial court of the nature of the objection — this specificity requirement is to enable the trial court 'to know in what respect the defendant regards the charge as defective and to afford him an opportunity to correct it before reading the charge to the jury.'" *Harkins*, 268 S.W.3d at 747 (quoting *Pennington v. State*, 697 S.W.2d 387, 390 (Tex.Crim.App. 1985)). In this case, Holland never raised with the trial court the issue he now argues on appeal. He never advised the trial court of the reasoning behind the general objection made at trial. Because Holland's objection does not comport with his complaint on appeal, we treat this issue as one of unobjected-to charge error.

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex.Crim.App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.* If error occurred, whether

7

it was preserved determines the degree of harm required for reversal. *Id.* Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex.Crim.App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985)(op. on reh'g); *see* TEX.CODE CRIM.PROC.ANN. art. 36.19.

Before reaching the question of harm, we must first determine whether there was error in the charge. The jury charge authorized conviction of Holland either as a primary actor or as a party to murder. Holland recognizes that "a review of the evidence shows that the alleged conduct of Appellant was sufficient to sustain his conviction for the offense of murder as alleged in the indictment without consideration of the actions of a non-defendant actor who was present with Appellant."[6] Holland then argues that the test set forth in *McCuin v. State*, 505 S.W.2d 827 (Tex.Crim.App. 1974) should apply:

> Where the evidence introduced upon the trial of the cause shows the active participation in the offense by two or more persons, the trial court should first remove from consideration the acts and conduct of the non-defendant actor. Then, if the evidence of the conduct of the defendant then on trial would be sufficient, in and of itself, to sustain the conviction, no submission of the law of [parties] is required.

*Id.* at 830. The State responds that these guidelines from *McCuin* should be "disavowed because the Court's statements were dicta."

Holland contends that a law-of-parties instruction is erroneous if there is sufficient evidence to convict the accused as a principal actor. "But submission of one theory does not prohibit the submission of the other." *Ryser v. St*ate, 453 S.W.3d 17, 28 (Tex.App.—Houston [1st Dist.] 2014, pet. ref'd); *see Goff v. State*, 931 S.W.2d 537, 545 (Tex.Crim.App. 1996). Even if the

---

[6] Thus, Holland has not challenged the sufficiency of the evidence supporting his conviction for murder. *See Walter v. State*, 588 S.W.3d 682, 688 (Tex.App.—Eastland 2019, pet. ref'd).

theory that the accused operated as the principal actor is the "theory best supported by the evidence," if there is evidence to support the inference that the accused acted as a party to the offense, the trial court does not err in giving a parties instruction. *Id*. at 545.

If the evidence introduced upon the trial of the case simply raises an issue, that the conduct of the defendant then upon trial is not sufficient, in and of itself, to sustain a conviction, then the State's case rests upon the law of parties and is dependent, at least in part, upon the conduct of another. *Hill v. State*, No. 03-99-00151-CR, 1999 WL 1023729, at*2 (Tex.App.—Austin Nov. 12, 1999, no pet.)(not designated for publication). In such a case the law of parties may be submitted. *See Gilmore v. State*, 666 S.W.2d 136, 156 (Tex.App.—Amarillo 1983, pet. ref'd). "When the evidence is sufficient to support both primary and party theories of liability, the trial court does not err in submitting an instruction on the law of parties." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App. 1996)(op. on reh'g); *Bell v. State*, No. 03-00-00243-CR, 2001 WL 1510836, at *6 (Tex.App.—Austin Nov. 29, 2001, pet. ref'd)(not designated for publication); *see also Tucker v. State*, 771 S.W.2d 523, 529 (Tex.Crim.App. 1988). Evidence is sufficient to prove the defendant on trial as a party to an offense when the evidence shows that at the time of the offense, the parties were acting together, each doing some part of the common purpose. *Cordova v. State*, 698 S.W.2d 107, 111(Tex.Crim.App. 1985), *cert. denied*, 476 U.S. 1101 (1986).

The evidence indicated there were two men involved in the assault on Munoz. They acted together in many of the activities connected to the murder. The understanding of each party was clear when the party originally driving the SUV to the campsite asked Holland if he wanted the pistol. Otero testified that two people were holding up a third person and taking turns at administering blows to that person. She testified that both individuals dropped the victim of the

9

assault and then kicked and stomped the head of that person. Otero later observed that victim to be Munoz. Baros testified that the person with Holland kept fighting with him so that he could not assist Munoz. He also testified that the original driver was the last to kick Munoz before the attackers ran for their vehicle. Both the neurosurgeon and the deputy medical examiner testified that Munoz died as a result of multiple blunt force injuries to her brain. Neither expert testified that one blow was sufficient to have caused the death of Munoz or identified which blow actually caused her death. We believe this evidence sufficient to raise the issue that Holland may not have acted alone in this murder but instead may have acted together with the individual who drove the SUV to the campsite. The trial court did not err in giving a parties instruction. *McCuin*, 505 S.W.2d at 830.[7]

Even if we were to assume error in the jury charge by the inclusion of the instruction on the law of parties, the error would be harmless. Holland conceded on appeal that his "conduct was sufficient in and of itself to sustain the jury's finding of guilt . . . ." If, as Holland claims, the evidence clearly supports his guilt as a primary actor, error in charging on the law of parties is harmless. *Cathey v. State*, 992 S.W.2d 460, 466 (Tex.Crim.App. 1999); *Black v. State*, 723 S.W.2d 674, 675 (Tex.Crim.App. 1986); *Govan v. State*, 682 S.W.2d 567, 570-71 (Tex.Crim.App. 1985). Having failed to show harm, Holland also has failed to show egregious harm.[8] We overrule Holland's sole issue.

**CONCLUSION**

---

[7] We decline the invitation of the State to "disavow" higher court caselaw.

[8] Even if Holland had preserved the alleged error to the jury charge by proper objection, the outcome would be the same. "Even where proper objection is made at trial, we have held that where, as in the instant case, the evidence clearly supports a defendant's guilt as the primary actor, error in charging on the law of parties was harmless." *Cathey*, 992 S.W.2d at 466.

Having overruled Holland's sole issue, we affirm the trial court's judgment.


June 11, 2021

LEE GABRIEL, Senior Justice (Ret.)

Before Palafox, J., Alley, J. and Gabriel, Senior Justice (Ret.)
Gabriel, Senior Justice (Ret.)(Sitting by Assignment)

(Do Not Publish)