

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. AP-76,994

**Ex parte DAVID LYNN BRATCHER, Applicant**

**ON APPLICATION FOR A WRIT OF HABEAS CORPUS
CAUSE NO. 1037467-A IN THE 182nd DISTRICT COURT
HARRIS COUNTY**

KELLER, P.J., delivered the opinion of the Court in which MEYERS, PRICE, KEASLER, and HERVEY, JJ., joined. COCHRAN, J., filed a concurring opinion in which JOHNSON, J., joined. WOMACK and JOHNSON, JJ., concurred. ALCALA, J., did not participate.

Applicant was convicted of aggravated sexual assault of a child and sentenced to seventy-five years in prison. In his habeas application, applicant contends that his trial counsel, Jules Laird, rendered ineffective assistance in a number of respects. We filed and set three of his allegations, in which he claimed counsel was ineffective because:

(1) Counsel failed to determine before voir dire examination that applicant wanted the court to assess punishment and allowed the prosecutor to inform the jury panel of the enhanced range of punishment if the defendant had prior convictions even though the jury did not assess punishment.

(2) Previous counsel violated the attorney-client privilege by giving a document received from applicant to a psychologist without applicant's knowledge and consent, and trial counsel failed to file a motion in limine and object to the document on the basis that the State obtained it as a result of previous counsel's violation of the attorney-client privilege and was an inadmissible prior consistent statement.

(3) Counsel opened the door to testimony that applicant was convicted of sexually assaulting the complainant in Dallas and sentenced to 55 years in prison.[1]

## I. FACTUAL BACKGROUND

### A. State's Evidence

Applicant opened a sports-trading-card shop in Dallas sometime between August and November 1990. Shortly thereafter, the complainant (C.W.) and one of his older brothers (J.W.) began associating with applicant and his two stepsons and began working at the shop. In January 1991, applicant and several boys—including C.W., J.W., and one of applicant's stepsons (J.G.)—traveled to Houston to attend a trading-card show. Two retired members of the Harlem Globetrotters—Meadowlark Lemon and Curly Neal—were present and posed for a photo with the boys. While they were in Houston, applicant and the boys stayed at the house of Herbert Weaver, a friend of applicant.

According to C.W., the group spent two nights at Weaver's house. One of those nights, C.W. slept in the same bed with applicant in an upstairs guest room. C.W. awoke the next morning to feel applicant rubbing his stomach. Applicant began fondling C.W.'s penis and eventually performed oral sex on him. At the time this incident occurred, C.W. was twelve years old. After this incident, applicant molested C.W. on numerous other occasions until C.W. was sixteen or seventeen years old. C.W. recounted that applicant had molested him between fifty and one hundred times. Except for another trading-card-show trip to Houston in January 1993 (which J.G. and J.W. did not attend), these other incidents all occurred in Dallas. At some point, applicant warned C.W. not to tell anyone about these incidents or applicant would have C.W. "taken care of." C.W. interpreted that statement

---

[1] We have renumbered applicant's allegations. They were allegations 2, 4, and 7 in the application.

to mean "death."

At some point, C.W.'s family was having financial troubles. When C.W. was sixteen years old, applicant bought him a car. The record contains faxes, sent by C.W. to applicant at about the same time, offering free tans at a tanning salon and depicting homosexual acts, as well as pictures and notes indicating an affectionate relationship.

C.W. testified to having trust issues with his high-school girlfriend and others. He explained that he was depressed, anxious, and extremely jealous. He further explained that he did not know who to trust, that he felt that he was taken advantage of at a young age and "it just really took a part of me that I never got to fully develop." He said that he and his girlfriend broke up because he "pretty much drove her away."

After he broke up with his girlfriend, C.W. decided that he needed help, so he visited a doctor. C.W. mainly talked about his girlfriend but also mentioned that he had been sexually abused. The doctor prescribed an anti-depressant, but C.W. visited her only a few times, because he could not afford it.

In 1999, while living in California, C.W. told his brothers, Ross and J.W.,[2] in vague terms, about applicant molesting him. They were livid about it. Around that time, C.W. sent applicant a letter confronting him about what he had done. C.W. stated that the letter expressed his true feelings in the harshest manner that he could put on paper. After the letter was sent, applicant never attempted to contact C.W. again.

Later that year, C.W. moved back to Texas, and he sought help for depression from Fayteen Marshall, a licensed professional counselor. C.W. saw Marshall for approximately four months.

---

[2] C.W. and Ross both testified about C.W.'s outcry. J.W. did not testify.

C.W was using marijuana heavily, which Marshall advised him to stop. She also recommended that he get on anti-depressants. C.W. expressed confusion and sometimes thought he was at fault for the sexual abuse he had suffered. Marshall testified that C.W. carried a lot of shame for what happened, that he had sexual-identity issues, that he had low self-esteem, and that he had had suicidal feelings in the past. Testing showed that C.W. had "severe anxiety" that was "off the chart." Each session, Marshall advised C.W. to tell his parents. At some point during treatment, C.W. told his father, who was supportive of C.W. but angry with applicant. A few days later, C.W. told his mother, who was also upset.

In January 2002, C.W. called the Dallas Police Department about applicant's molestation of him over the years. Detective Joseph Corden took the call and was subsequently assigned to the case. In March 2002, he arranged the recording of a phone call between C.W. and applicant without applicant's knowledge.[3] The contents of that conversation convinced Detective Corden that probable cause existed to arrest applicant.

### B. The Letter

During the State's direct examination, C.W.'s letter to applicant was read by C.W. to the jury as follows:

> David Bratcher, I'm writing you a letter that I feel is well overdue and I feel I need to write to you. What you did to me, when I was younger was a very cold and one of the most awful things anyone could do to another human being. You not only took advantage of me at a young age, you have made me very emotionally unbalanced. You know very well what you did, and I think of you as one of the sickest minded human beings that has ever walked the face of this earth.

---

[3] Because C.W. knew that the phone call was recorded, the recording did not violate Texas law. *See* TEX. PENAL CODE § 16.02(c)(3)(A) (West 2004) (affirmative defense to prosecution if a person acting under color of law intercepts a wire, oral, or electronic communication if one of the parties to the communication has given prior consent to the interception).

I not only trusted you as my boss, my friend, but my whole family did as well. Now that I look back over what you did to me, you were never a friend to me or my family. Because of this, I have not been able to give a hundred percent of my trust to anybody including my family, my friends, and my relationships that I have been in. I put a lot of trust into you, and why wouldn't I? But you took that trust and absolutely demolished it.

I think you have some very major problems. Otherwise you never would have done to me what you did. Who knows who else you have done this to. All the times that you told me you were my friend, now I know what you were really wanting from me. You are nothing but a pedophile.

You have taken a part of my life and completely ruined it. I've been in a deep depression for a number of years. And after knowing what happened to my family before this, you just saw me as a vulnerable little boy and took advantage of the situation.

How do you even live your life as a Christian? You're much closer to the devil. You portray a life totally unlike the one you live. I've just noticed so many things about you. And it's no wonder why you live alone and have no friends because you are a sick, sick, sick, sick, sick excuse of a human being. And, in fact, I bet the whole reason that you opened All Pro Sports Cards was to be like a lion over his prey. Little boys.

I don't want to ever have contact with you again. I've already told both Ross and [J.W.] what you did to me. And you better hope and pray that our paths never cross again in the future. Should you ever have contact with anyone in my family or that I know, I promise I will ruin your life. I promise. I hope that you rot in Hell because I know that I won't see you in heaven. Signed Corey.

Also, find a way to make [J.G.] quit his job with my father. That could just be contact with people I know, and I already told you what I would do.[4]

**C. Recorded Telephone Call**

The recorded telephone conversation between C.W. and applicant was played to the jury.

In that conversation, applicant admitted to having a sexual relationship with C.W. but claimed that

C.W. initiated the conduct, that it occurred when C.W. was eighteen, and that it lasted only a short

time. Applicant claimed that this experience caused him to fall in love with C.W., and although he

was not gay, he would have that experience again.

---

[4] The written version of the letter, admitted as an exhibit, contains minor stylistic discrepancies from C.W.'s reading of the letter to the jury. Also, we replaced J.W.'s and J.G.'s names in the letter with initials.

But applicant made various statements in the telephone conversation that indicated that applicant had harbored unusually affectionate feelings towards C.W. even when C.W. was a child: "I think about you all the time," "[Y]ou're still my best friend I've ever had," "I gave you everything," "I've got every note, every fax, every letter that you ever wrote to me. I've still got every one." Applicant further said, "I've got the very graphic things too that you sent to me."

Applicant also described two types of conduct that he claimed C.W. engaged in as an adolescent, in which C.W. arranged on his own initiative to be in applicant's presence when applicant was nude. First, he claimed that C.W. would crawl through a dog door to get inside applicant's house while applicant was taking a bath.[5] Second, applicant claimed that C.W. would unlock a door at the tanning salon and walk in when applicant had no clothes on. Applicant never said that he reported such inappropriate behavior to C.W.'s parents or anyone else. Applicant maintained: "I always respected your privacy and I never repeated anything you ever said to me."

In a few instances during the conversation, applicant changed his story about events when pressed by C.W. When C.W. referred to the Houston trip that included J.W. and J.G. (which was the first trip), applicant maintained that he slept in a bed upstairs while C.W. slept downstairs. When C.W. stated that J.W. would know what happened, applicant said, "Wait a second, when [J.W.] went with us," applicant slept downstairs on a fold-out sofa with J.W. Applicant further stated, "You've go the trips mixed up." When C.W. referred to the time he spent with applicant in applicant's Cadillac, applicant said he had just gotten a divorce, but when pressed, he acknowledged that he and his wife were in fact still married at the time. Applicant said that C.W. was already driving when

_____

[5] To this statement, C.W. retorted, "Where were [J.G.] and [applicant's other stepson]? Where would they have been at this time?"

he worked for a tanning salon, but when pressed, applicant acknowledged that C.W. did not yet have a car, but applicant maintained that C.W. did have a driver's license.

At one point applicant said, "Okay, do you just need somebody to cuss at or somebody to blame, do it to me. I mean really, if that will help you get on with your life, then say whatever you want to to me and I'll accept it. I mean really, I want you to have a good life."

Numerous times in the conversation, when C.W. pressed applicant to explain what happened to C.W. as a child, applicant told C.W. to come and see him. But later, when C.W. suggested that he would take applicant up on his offer and come talk to him in person, applicant appeared to demur, saying, "Well, you'll have to call me." At various times, applicant expressed suspicion about the telephone call—referring to C.W.'s letter that told applicant not to contact him, suggesting that C.W. was trying to set him up, and asking who was sitting there with C.W.

Applicant mentioned C.W.'s letter six times during the conversation. The first time C.W. broached the subject of being molested, applicant said that he was "very confused" by the letter. Later, applicant told C.W. to come and see him to explain the letter to him. In his third reference to the letter, applicant stated, "[A]ll I got was a letter from you saying you didn't want me to contact you again." Later, he said, "I can't get past the fact you wrote me a letter when what happened with us when you were eighteen was your initiation." A fifth time, applicant referred to the letter as follows: "[Y]ou all of a sudden wrote me a letter and started saying a bunch of stuff that I didn't even know what you're talking about" and saying that C.W. had already told his brothers. The final time he referred to the letter, applicant said, "You blew my mind when you wrote that letter."

### D. Defense's Evidence

On cross-examination, C.W. acknowledged that he had a shoplifting conviction from 2004

or 2005, which occurred around the same time he began talking to the Houston police. He also acknowledged that his family finances were bad in 1990. When questioned about whether J.W. slept in the same bed with applicant during the 1991 Houston trip, C.W. replied that they stayed at Weaver's house for multiple nights and he did not remember if J.W. slept with applicant on one of those nights. Nevertheless, C.W. had a "very vivid memory" of applicant sexually assaulting him on that trip because it was C.W.'s first sexual experience.

Weaver testified for the defense. He claimed that applicant and the boys stayed only one night at his house in January 1991. He also testified that there was no bed in the upstairs guest room at that time. He further testified that applicant and the boys slept downstairs in the living room, but Weaver acknowledged that he went to sleep before everyone else.

J.G., one of applicant's stepsons, also testified for the defense. He said that he never noticed any unusual behavior between applicant and C.W. He acknowledged that applicant sometimes gave C.W. things and that C.W. sometimes sat on applicant's lap, but he maintained that those events occurred with C.W. no more often than with applicant's step-children or their other friends.

Regarding the January 1991 trip to Houston, J.G. said that applicant and all the boys spent only one night at Weaver's house, and they all slept in the living room. J.G. said that he and C.W. slept on the floor near each other in sleeping bags while applicant slept on a couch, which might have been a pull-out sofa bed. He also said that he had a bad case of poison ivy at the time that kept him awake most of the night. As far as he knew, C.W. did not leave his sleeping bag that night.

J.G. also testified that he and C.W. had a sexual relationship that began a month before the January 1991 trip. On cross-examination, J.G. acknowledged that his memory of dates was fuzzy, and that it was possible that his first sexual encounter with C.W. occurred in January or February of

1991. On rebuttal, C.W. acknowledged that he and J.G. had, in fact, had a sexual relationship, but C.W. maintained that the relationship began after the January 1991 incident with applicant.

## II. PROCEDURAL BACKGROUND

### A. Dallas Charges

Applicant was indicted in Dallas for acts committed against C.W. He gave his attorneys, Rick Russell and Reed Prospere, the letter that C.W. had written to him. Russell and Prospere used numerous experts on applicant's behalf, including Dr. Randall Price. In his habeas affidavit, Prospere stated that applicant was aware that his attorneys had a "full disclosure" policy with their experts and were not selective with any information they had. Prospere further stated that applicant knew of this and never objected, nor did he suggest that his attorneys not disclose any information he gave them. C.W.'s letter was disclosed to Dr. Price in the course of his work in assisting the defense, and Dr. Price testified for the defense at trial. After Dr. Price's testimony on direct examination, the State asked to see his file. In the heat of battle during trial, Prospere offered the letter into evidence, without consulting applicant, because he was certain that the State would offer it if he did not.

Applicant was convicted and sentenced to fifty-five years in prison, but a motion for new trial was granted.

### B. Houston Indictment

Applicant was subsequently indicted in Houston for the offense of aggravated sexual assault of a child. For enhancement purposes, the Houston indictment alleged that applicant had previously been convicted in 1979 of sexual abuse of a child.

### C. Voir Dire

During jury selection, the prosecutor approached the bench and told the judge and defense counsel that she intended to talk about punishment. The judge responded that there was no punishment election for a jury in the file, so punishment would be to the court. Defense counsel Laird responded that punishment was supposed to be to the jury and that he thought applicant's previous attorney had filed an election. After some discussion, the prosecutor said that she did not mind if the defense wanted to elect jury punishment. Laird responded, "That's what we had anticipated all along." The judge then directed, "Go ahead and get it filed right now and then I'll give you some time to talk to them about punishment."

After the bench conference, the prosecutor discussed the punishment range for the offense of aggravated sexual assault, the punishment range with one prior conviction, and the punishment range with two prior convictions. She also discussed the punishment range for the lesser-included offense of sexual assault, the range if the lesser offense were enhanced by one prior conviction, and the range if the lesser offense were enhanced by two prior convictions. The prosecutor's discussion was hypothetical, and she never told the venire that applicant had any prior convictions. After this discussion, the prosecutor asked the venire—first in general and then row by row—if anyone had a problem with the punishment ranges discussed. She received responses from several prospective jurors and passed the discussion to defense counsel.

Laird then approached the bench and informed the trial judge that applicant was refusing to sign the punishment election. According to Laird, applicant was concerned that the current judge presiding over jury selection (Judge Jeannine Barr) would not be the same judge that was presiding over the trial (Judge Mary Bacon). When asked if applicant was now interested in having the punishment phase tried before the judge, Laird responded that applicant might want to have it before

the current judge (Judge Barr) but not before Judge Bacon, because applicant did not know her. The judge suggested the possibility that she would be available for punishment proceedings "by way of a P.S.I. if he's found guilty." A break was taken for Laird to explain the situation to applicant.

After the break, Laird proceeded with voir dire. He referred only once to the possibility of having a prior conviction, to explain that a person might choose not to testify to avoid being impeached with a prior conviction at the guilt phase of trial. He gave the hypothetical of being accused of sexual assault and having a prior conviction for theft.

## D. Trial

Applicant pled "not guilty," and the guilt phase of trial was conducted before a jury, with Judge Bacon presiding. Applicant did not testify, and no one mentioned applicant's 1979 conviction.

In her opening statement, the prosecutor briefly talked about the recorded telephone conversation between C.W. and applicant. She stated that Officer Corden recorded the conversation, that C.W. was trying to get applicant "to admit all the abuse," and that applicant appeared to be suspicious about the phone call. Laird objected to the prosecutor discussing what was in the defendant's mind in opening statement, the objection was sustained, and the jury was given an instruction to disregard.

In his opening statement, defense counsel also referred to the recorded telephone conversation. Defense counsel said, "I think when you look at the tape and you make your own conclusions from it, you will see that it is not somebody who has guilty knowledge or guilty actions that made that tape recording. You will see that the Dallas Police Department used [C.W.] as bait to try and lure him into a false admission and it wasn't done." Defense counsel further stated, "You will actually hear the defendant's voice. You'll hear his comments. You'll hear his statements,

unbeknownst to him and as a setup with the Dallas Police Department and [C.W.] as bait saying that this occurred."

During C.W.'s direct examination, the State offered into evidence the letter that C.W. had written to applicant. Laird objected that the letter was "self-serving," "cumulative of the testimony already given to the jury," and "meant only to inflame the minds of the jury." He argued that the prejudicial effect of the letter outweighed its probative nature because C.W. had "already testified to all of this." The State responded that the letter "goes to show the relationship at the time between the victim and the defendant. His first time he ever told the defendant and approached him with this topic. And it's relevant to the sequence of the case." Laird responded that C.W. "had time to compose it and put in there what he wanted to as opposed to saying, 'Here's what happened and this is what I did.'" And Laird argued that C.W. had "already told two other doctors before that time period." The trial judge overruled the defense objections and admitted the letter, which C.W. later read to the jury.

In response to defense questioning about prior statements made by C.W. regarding his age when he had his first sexual experience, the State questioned C.W. about statements he made at a Dallas hearing. In subsequent cross-examination, defense counsel asked C.W.: "All your time and effort that you put into your testimony under oath in Dallas as to the number of events and occasions it happened, that bothered you when you didn't get the result that you wanted, didn't it?" The State objected to the question, and the objection was sustained. At a bench conference, the State argued that this question by defense counsel created a false impression and opened the door to the results of the Dallas trial. Defense counsel argued that his questioning did not open the door, and also that because the State's objection was sustained, he never received an answer to his question. But Judge

Bacon sided with the State and ruled that evidence about the Dallas trial would be admitted. C.W. was then permitted to testify that applicant was convicted at a jury trial in Dallas and sentenced to fifty-five years in prison but that there was a problem with the jury charge that caused the case to be dismissed with the possibility that it might be retried. On cross-examination, Laird questioned C.W. more about the dismissal and then asked if it was correct that C.W. was not happy, "because that's when the charges got filed here in Houston, was after the results of the case in Dallas were overturned." C.W. responded, "The only reason I'm not happy is it's not over from the original charges being guilty and I'm still having to deal with this when all I want to do is put it behind me."

Over Laird's objection, Judge Bacon submitted the lesser-included offense of sexual assault in the jury charge. The jury charge also included instructions regarding extraneous offenses and prior convictions, which appear to be a response to the evidence of applicant's extraneous offenses against C.W. in Dallas and the conviction arising from those offenses that was later overturned. The jury was instructed that it could not consider extraneous offenses unless it found beyond a reasonable doubt that applicant had committed them and that those offenses could be considered only for certain specified purposes (e.g. motive, opportunity). The jury was instructed that prior convictions could not be considered as any evidence of guilt, and that such evidence was admitted "for the purpose of aiding you, if it does aid you, in passing upon the weight you will give that certain evidence, and you will not consider the same for any other purpose."

Jurors were also given a general instruction not to consider matters that were not in evidence:

> During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

In closing argument, the prosecutor argued that C.W. had no motive to lie and that, C.W.,

as a heterosexual male with "a girlfriend sitting outside," was undergoing great embarrassment in testifying. The prosecutor further argued that applicant was a pedophile and that the sexual contact between C.W. and J.G. was proof that applicant had abused C.W. because it was not normal for twelve-year-olds to engage in such conduct.

The prosecutor also argued that C.W. accurately remembered details associated with the 1991 trip to Houston: the Harlem Globetrotters and the Boy Scout paraphernalia upstairs at Weaver's house. And she argued that the recorded telephone conversation showed that applicant was perverted, had an abnormal relationship with C.W., and was molesting C.W. The prosecutor made no mention of prior convictions.

Laird's closing argument included a discussion about the Dallas trial. He told the jury that the Dallas case had been dismissed and then, "after the Dallas case didn't do any good," C.W. had essentially said, "Wait a second. . . . There was one time in Houston at Herb Weaver's house in 1991 that I was sexually assaulted. It was my first sexual experience." Laird then referred to the testimony from J.G. to show that it was "not [C.W.'s] first sexual experience, that it was a long list of sexual experiences." Laird argued that C.W.'s allegations were the result of his confusion about his own sexual identity, not from a sexual assault committed by an adult.

Near the end of his closing argument, Laird admonished the jury to focus on whether the Houston offense occurred:

> The point is it [the Houston offense] occurred in January of 1991 or it didn't. If you believe beyond a reasonable doubt that the proof shows to you that it didn't occur in January of 1991 in Herb Weaver's house, then find him not guilty and get out of here and be done with this and let him go back to Dallas and let them decide what they're going to do up there because that is not your concern. Your concern is that he's already been tried for a case in Dallas and the case has been dismissed. "Well, let's try him on this one event in Houston." When does this madness stop? How many trials do you have to go through? How many trials does that man and his family have

to go through?

The jury found applicant guilty of aggravated sexual assault. Punishment was tried to Judge Barr, who assessed punishment at seventy-five years in prison.

### E. Habeas Evidence

#### 1. *Voir Dire / Enhancement Claim*

In his affidavit, Laird said that he fully discussed with applicant his options for jury or judge sentencing. Before trial began, applicant said that he wanted a judge to assess punishment, not a jury. Laird said that he explained to applicant that Judge Barr, not Judge Bacon, would be assessing punishment, and that in his opinion, Judge Barr might assess a harsher punishment because of the nature of the conviction and in light of the presentence report. Laird stated that he had believed that applicant's previous attorney had filed a jury election, "but the bench discussion gave me one more opportunity to confirm with Mr. Bratcher that he did not want the jury to assess punishment."

Laird further stated that he allowed the prosecutor to discuss the full range of punishment for enhanced offenses because he had used the same tactic in a trial six months earlier (*State v. Collins*) and secured an acquittal. He said that he believed that jurors who were easier on punishment would also be less inclined to find a defendant guilty.

At the habeas hearing, Laird reiterated some of the responses in his affidavit, but he also testified to other facts. He testified that applicant had passed a polygraph test and that the polygraph examiner was one that Judge Barr used in connection with sex-offender probationers. Applicant wanted punishment to be assessed by Judge Barr because, if he were convicted, she would at least know that he passed a polygraph conducted by an examiner on whom she often relied. Laird also testified that he knew at the time the State was questioning the venire about punishment that

punishment would be assessed by the judge.

But Laird did not want punishment to be assessed by a judge; he preferred a jury. He claimed that he told the judge[6] that he wanted the jury to assess punishment, not that he thought the jury was assessing punishment. Laird testified that he did not want the judge to assess punishment because he thought Judge Barr would be too harsh on applicant. Laird acknowledged that jury assessment of punishment was against applicant's wishes and that who assessed punishment was applicant's call.

During questioning, Laird reiterated that he allowed the prosecutor to ask questions about enhancements because the prospective jurors' answers to those questions would help him determine which jurors would be more lenient at the guilt stage of trial. Laird believed that the prosecutor, by framing her questions hypothetically, avoided informing the jurors of applicant's prior convictions. When asked further about the *Collins* case, Laird acknowledged that the defendant had elected for the jury to assess punishment.

Laird also said that he had not reviewed his case file before executing his affidavit or testifying at the habeas hearing because his file was lost. He also said that he had not reviewed the trial record except for a small portion sent by habeas counsel.

Applicant testified that he told his attorney that he wanted the judge to assess punishment because of the polygraph he had taken and the fact that the examiner was someone upon whom Judge Barr relied. Applicant testified that he never told counsel that he wanted a jury to assess punishment.

### 2. The Letter

---

[6] At the habeas hearing, both habeas counsel and Laird were under the mistaken impression that Judge Bacon had presided over jury selection.

In his affidavit, Laird stated that he was never made aware of communications between applicant and the Dallas attorneys, that applicant did not inform him how the State had obtained the letter, and that he (Laird) did not know that the Dallas prosecutor had, in fact, obtained the letter. Laird stated that he was "genuinely surprised by the letter" and that Judge Bacon would let it in after C.W. had testified to the same facts on direct examination. Laird further said, "That was the first time I had heard about the letter, and that it had been used by the other attorneys." Although Laird had reviewed the testimony of every witness in the Dallas trial, he did not recall seeing the letter. He contended that he did not find any mention of the letter in the record of the Dallas trial.

At the habeas hearing, habeas counsel pointed to where the letter had been admitted into evidence and read by C.W. to the jury in the Dallas trial. Laird acknowledged that he had made a mistake. Laird also acknowledged that, in the heat of battle in the Houston trial, he did not think of objecting to the admission of the letter on the basis that it was an inadmissible prior inconsistent[7] statement. In retrospect, he "would have loved to have made that objection."

### 3. *Dallas Trial Claim*

In his affidavit and at the habeas hearing, Laird said that he did not believe that he had opened the door to the results of the Dallas trial by asking C.W. whether he was satisfied with the results. During the habeas hearing, Laird acknowledged that he did not want the jury to know about the results of the Dallas trial. Later in the habeas hearing, Laird said that he "should not have asked that question." But Laird articulated a strategy for asking the question:

> I was trying to give the jury the impression that as much as he had wanted to convince them that all of these prior bad acts between him and Mr. Bratcher

---

[7] Habeas counsel framed the question using the word "inconsistent," but he appears to have meant "inadmissible prior *consistent* statement."

obviously must have been bad and must have been something that the jury should have considered, that it frustrated him and that he was made and came to Houston to file this case, so that it frustrated him from the standpoint that as much as he was able to get in in Dallas, and yet he still wasn't able to get the conviction so he comes to Houston to get a conviction in Houston.

In his affidavit and during the hearing, Laird opined that opening the door to the results of the Dallas trial did not change the outcome of the Houston trial.

## F. Habeas Judge's Findings

### 1. *Voir Dire / Enhancement Claim*

The habeas judge[8] made the following relevant findings regarding the voir dire claim:

10. The applicant testified that he desired the court to assess punishment.

11. The court did, in fact, assess punishment.

12. The court finds credible the assertion by Jules Laird that he wished to voir dire the jury on ranges of punishment because he believed it was a strategic device helpful in determining which jurors would be desirable/undesirable in guilt/innocence, even in a case where the judge was going to assess punishment.

13. The jury was never informed during voir dire whether the defendant had any prior convictions; all discussions were properly had in the hypothetical.

14. The applicant fails to demonstrate that Laird's chosen strategy regarding voir dire, and his choice not to object to the State's punishment voir dire, fell below an objective standard of reasonableness.

15. The applicant fails to demonstrate that but for Laird's chosen voir dire strategy, a reasonable probability exists that the result of the proceeding would have been different.

### 2. *The Letter*

Regarding the admission of C.W.'s letter, the habeas judge made the following findings:

21. The January 22, 1999 letter from the complainant to the applicant was introduced

---

[8]  Judge Randy Roll.

as evidence at the applicant's trial in Dallas by his attorney Reed Prospere.

22. The aforementioned trial in Dallas took place before the trial in the instant cause.

23. The court finds credible Prospere's assertion that the letter was not divulged to the defense expert in violation of attorney-client privilege.

24. The applicant never told Laird he believed the letter had been divulged in violation of attorney-client privilege.

25. Laird's failure to object to the letter, on the basis that it was obtained in violation of attorney-client privilege, did not fall below an objective standard of reasonableness, especially in light of the fact that it was an exhibit in a prior trial *and* the prior attorneys deny a violation of privilege *and* the applicant never advised him it was divulged in violation of privilege.[9]

26. The applicant fails to show that but for the admission of the January 22, 1999 letter, a reasonable probability exists that the results of the proceeding would have been different.

### 3. *Dallas Trial Claim*

With respect to the allegation regarding the Dallas trial, the habeas court found:

38. Counsel made a strategic decision to cross-examine the complainant in the instant case with the fact that the complainant "did not get the result [he] wanted [in Dallas]" to show that the complainant was so frustrated, he made up the incident in Houston, which did not have the same evidentiary problem the Dallas case had.[10]

39. Counsel did not believe that his cross-examination would open the door to the result of the Dallas trial.

40. The applicant's appellate counsel (who is also habeas counsel) also argued on direct appeal that trial defense counsel's question *did not* open the door to the result of the Dallas trial.

41. The Court finds that counsel's opening the door to the Dallas verdict fell below an objective standard of reasonableness.

---

[9] Emphasis in original.

[10] Brackets in habeas court's findings.

42. The applicant fails to demonstrate that but for Laird opening the door, a reasonable probability exists that the result of the proceeding would have been different.

### III. STANDARD

In addressing claims of ineffective assistance of counsel, we employ the familiar two-part standard articulated in *Strickland v. Washington*[11] that requires a showing of deficient performance and prejudice.[12] With respect to the deficient performance prong, we examine whether counsel was acting "within the range of competence demanded of attorneys in criminal cases."[13] Our review of counsel's performance is highly deferential, with a strong presumption that counsel acted in accordance with a considered trial strategy.[14] Although we look to prevailing professional norms,[15] trial counsel will not be deemed deficient simply because his trial strategy was "risky, and perhaps highly undesirable to most criminal defense attorneys."[16]

With respect to the prejudice prong, we must determine whether there is a reasonable probability that the outcome would have been different but for counsel's deficient performance.[17] A reasonable probability is one that is sufficient to undermine confidence in the result.[18] This

[11] 466 U.S. 668 (1984).

[12] *See Ex parte Ellis*, 233 S.W.3d 324, 329-30 (Tex. Crim. App. 2007).

[13] *Id.* at 330.

[14] *Id.*

[15] *Id.*

[16] *Id.* at 331.

[17] *Id.* at 330.

[18] *Id.*

standard does not require a showing that counsel's actions "more likely than not altered the outcome," but "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case."[19] "The likelihood of a different result must be substantial, not just conceivable."[20]

## IV. ISSUE 1: VOIR DIRE

Rather than address complex issues concerning deficient conduct, we choose to address only the prejudice prong of *Strickland* with respect to this issue. We observe that the prospective jurors were never told in voir dire that applicant had a prior conviction. We also observe that the State's voir dire on punishment ranges—which included ranges for the charged offense, a lesser-included offense, and enhancements for both one and two prior convictions—would appear, at least to a layperson, to be comprehensive. A layperson might suspect that the prosecutor was talking about enhanced punishments because the defendant had at least one prior conviction, but a layperson might think that questioning about all of these punishment ranges was simply the general practice. In any event, the jury charge contained an instruction that the jurors were not to consider matters that were not admitted into evidence. We generally presume that jurors follow the instructions,[21] so we presume that jurors would not infer the existence of a prior conviction that no one has said exists.

In fact, if applicant had elected for the jury to assess punishment, no one would even seriously question the discussion of enhanced punishment ranges in voir dire. This is not because

---

[19] *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011).

[20] *Id.*

[21] *Casanova v. State*, 383 S.W.3d 530, 543 (Tex. Crim. App. 2012); *Young v. State*, 283 S.W.3d 854, 882 (Tex. Crim. App. 2009)

discussion of enhanced punishment ranges is a necessary evil when the jury assesses punishment. Rather, it is because such a discussion does not necessarily taint the jury—at least when the jury is not informed that a prior conviction exists and when the jury is instructed not to consider matters that are not in evidence.[22] If the defendant's rights at the guilt stage are not prejudiced by such a discussion when the jury is set to decide punishment, it is difficult to see how that changes simply because the judge is set to decide punishment instead. We hold that applicant has failed to satisfy the prejudice prong of *Strickland*.

## V. ISSUE 2: THE LETTER

### A. Deficient Performance

When the claim of ineffective assistance is that the attorney failed to object to the admission of evidence, part of what must be shown is that the trial judge would have committed error to overrule such an objection.[23] Thus, if we find that the trial judge would not have erred in overruling such an objection, then we need not assess whether counsel's failure to object was the result of trial strategy. With this caveat in mind, we address applicant's proffered bases for excluding the letter from evidence.

### 1. *Attorney-Client Privilege*

The attorney-client privilege gives the client the privilege to prevent the disclosure of

---

[22] *See Frausto v. State*, 642 S.W.2d 506, 509 (Tex. Crim. App. 1982) (quoting *Martinez v. State*, 588 S.W.2d 954 (Tex. Crim. App. 1979) (emphasis in original) ("Certainly, one can *inform* generally of applicable punishment without *reading* the precise allegations for enhancement, and thereby avoid what some have regarded as jeopardizing the presumption of innocence.").

[23] *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011); *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004).

"confidential communications" made within the attorney-client relationship.[24] But C.W.'s letter was not a communication that was made within the attorney-client relationship. C.W. was a third party, who stood outside that relationship.[25] The rule that codifies the attorney-client privilege contains a "[s]pecial rule of privilege in criminal cases," which provides that "a client has a privilege to prevent the lawyer . . . from disclosing any other fact which came to the knowledge of the lawyer . . . by reason of the attorney-client relationship."[26] But such a fact must still be one that is known only within the confines of the attorney-client relationship; facts known by others are not privileged.[27] C.W. obviously knew (at least at one time) the entire contents of the letter because he wrote it. We have indicated that the special rule of privilege is designed to cover attorney work product.[28] C.W.'s letter to applicant was clearly not attorney work product. But even if we set aside the fact that C.W.'s letter was not privileged because it originated from a third party, Prospere's affidavit, which was believed by the habeas judge, supports the proposition that applicant understood that the letter would not remain in confidence. So Laird did not perform deficiently in failing to object to the admission of the letter on the ground of attorney-client privilege. The habeas judge's finding to that effect is supported by the record.

### 2. *Prior Consistent Statement*

The habeas judge made no findings regarding applicant's contention that the letter was an

---

[24]  *See* TEX. R. EVID. 503(b)(1).

[25]  *See id*., subsections (A)-(E) (specifying the entities within the attorney-client relationship).

[26]  TEX. R. EVID. 503(b)(2).

[27]  *Landers v. State*, 256 S.W.3d 295, 309-10 (Tex. Crim. App. 2008).

[28]  *Cameron v. State*, 241 S.W.3d 15, 20 (Tex. Crim. App. 2007).

"inadmissible prior consistent statement." Applicant contends that the letter was inadmissible under Rule 613 because it failed to meet the heasay exclusion found in Rule 801(e)(1)(B). Rule 801(e)(1)(B) provides that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive."[29] We will assume, without deciding, that the letter did not qualify under this hearsay exclusion and that Laird should have been aware of that fact.

### a. Non-Hearsay Purpose

It does not necessarily follow from that assumption that the letter (or its contents) constituted inadmissible hearsay. Prior consistent statements within a letter might qualify under a hearsay exception, such as excited utterance,[30] or might be relevant to a non-hearsay purpose. Hearsay is defined as an out-of-court statement offered "to prove the truth of the matter asserted."[31] If the statements in the letter were relevant for a purpose other than the truth of those statements, then they would not be excludable as hearsay, though the statements might still be excludable under some other rule of evidence, subject to redaction, or subject to a limiting instruction.

Here, the contents of the letter were relevant to a non-hearsay purpose: to shed light on statements made by applicant during the recorded telephone conversation. Was applicant an innocent person responding to a false accuser, or was he a guilty person trying to hedge, minimize,

---

[29] TEX. R. EVID. 801(e)(1)(B).

[30] *See* TEX. R. EVID. 803(2). Although a letter might conceivably qualify as an excited utterance, we are not saying that the letter in this case did so. We merely cite the excited utterance exception for illustrative purposes.

[31] TEX. R. EVID. 801(d).

and deny his misconduct? Applicant referred to the letter six times during the recorded conversation to question C.W.'s motive in making the call, applicant expressed suspicion that the call was some sort of setup (which it was), and applicant made statements that could be seen as attempting to minimize responsibility.[32] Thus it was established that applicant knew the contents of the letter, and the jury could infer that the contents of the letter were a motivating force behind various statements made by applicant during the course of the recorded telephone conversation.

It is true that the letter was read to the jury before the recorded conversation was played. But defense counsel referred to the recorded conversation in opening statement. He specifically contended that the recording showed that applicant did not have "guilty knowledge or guilty actions" but instead showed C.W. trying to lure applicant into a false admission.

### b. Non-Bolstering Purpose

Applicant's argument does not depend solely upon a conclusion that the letter constituted inadmissible hearsay. Rule 613(c) provides that a prior consistent statement "is inadmissible except as provided in Rule 801(e)(1)(B)."[33] Rule 613 relates to the use of prior statements to impeach or support the testimony of a witness. Rule 613(c) essentially codifies the rule against "bolstering" to the extent that it "prevents the use of prior consistent statements of a witness for the *sole* purpose

---

[32] *See Morris v. State*, 361 S.W.3d 649, 652 (Tex. Crim. App. 2011) (expert testimony that grooming child sex victims can involve minimizing the offender's conduct); *Walter v. State*, 267 S.W.3d 883, 896-97 (Tex. Crim. App. 2008) (discussing "blame-shifting" statements that are designed to minimize culpability); *Williams v. State*, 273 S.W.3d 200, 214 (Tex. Crim. App. 2008) (defendant's statements that minimized the severity of his motives and actions could be viewed by the jury as indicating that the defendant's acceptance of responsibility was not genuine).

[33] TEX. R. EVID. 613(c).

of enhancing his credibility."[34]   The rule, however, "says nothing about the admissibility of substantive evidence that happens to corroborate a witness."[35]   For reasons explicated above, the letter's contents had substantive relevance apart from bolstering C.W.'s credibility.

### c. Rule 403

We now address other rules or doctrines under which evidence that is admissible for a limited purpose might be excluded or restricted.[36]   Otherwise-admissible evidence may be excluded under Rule 403 if there is a sufficiently high danger that the evidence will be used for inadmissible purposes as compared to the evidence's probative value with respect to the admissible purposes. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.[37]

This rule may be cited most often in criminal cases in connection with extraneous offenses that are found to be admissible for non-character purposes under Rule 404(b),[38] but it can also apply to out-

---

[34] *Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) (quoting *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993)) (emphasis added).

[35] *Cohn*, 849 S.W.2d at 820.

[36] Applicant does not allege that the evidence was inadmissible under Rule 403, that the letter could have been redacted, or that he was entitled to a limiting instruction, but because he did not anticipate the purpose for which we have found the letter to be relevant, and because this is an ineffective-assistance-of-counsel claim, we will address issues that naturally arise when evidence is offered for a limited purpose.

[37] TEX. R. EVID. 403.

[38] *See Montgomery v. State*, 810 S.W.2d 372, 386-97 (Tex. Crim. App. 1991) (op. on reh'g).

of-court statements found to be admissible for non-hearsay purposes or pursuant to some other rule.[39]

Laird made a Rule 403 objection when he argued that the prejudicial effect of the letter outweighed its probative value. Laird's statement that the letter was "self-serving" could be construed as referring to the bolstering potential of the letter, and his statement that C.W. had time to compose the letter and had already made outcry to two doctors could have been a reference to the hearsay potential of the letter. However, even if we conclude that Laird's Rule 403 objection failed to sufficiently apprise the trial court of the letter's potential use for bolstering and hearsay purposes, we conclude that the record does not demonstrate a Rule 403 violation as a matter of law.

Claims under the rules of evidence are generally reviewed for abuse of discretion, with an appellate court reversing only if the trial judge's decision is outside the zone of reasonable disagreement.[40] And with respect to evidentiary objections, the trial judge's discretion is the greatest when the rule at issue is Rule 403.[41]

In a Rule 403 analysis, a court must balance the probative force of the evidence and the proponent's need for the evidence against any tendency the evidence has to suggest a decision on an improper basis or to confuse or distract the jury from the main issues.[42] A court should also consider whether the jury is adequately equipped to evaluate the evidence, the amount of time needed to

---

[39] *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007). *See also Ex parte Wheeler*, 203 S.W.3d 317, 332 (Tex. Crim. App. 2008) (Keller, P.J., concurring) ("Most commonly, an unfair prejudice claim [under Rule 403] flows from the admission of evidence for a limited purpose under some other evidentiary rule, such as Rule 404(b), . . . Rule 411, Rule 801 (hearsay)").

[40] *Blasdell v. State*, 384 S.W.3d 824, 829 (Tex. Crim. App. 2012); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[41] *See Montgomery*, 810 S.W.2d at 378-79 (discussing cases and commentaries)

[42] *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006).

develop the evidence, and whether the proferred evidence merely repeats evidence that has already been admitted.[43]

The probative force of the letter was high because it figured prominently in applicant's recorded telephone conversation with C.W. and was highly relevant to applicant's state of mind and to assessing the meaning, significance, and credibility of statements made by applicant during the recording. The State's need for the evidence was also high because applicant described the letter in the recording only by saying that C.W. did not want contact with applicant and that C.W. had told his brothers. Applicant alluded to the fact that C.W. was making allegations in the letter but did not describe what those allegations were. To properly assess applicant's recorded statements, the jury needed to know the content of the letter. And assessing applicant's recorded statements was important because the recording was the only source of admissions from applicant that was available to the State.

The letter contained some highly inflammatory language, which posed some risk of suggesting decision on an emotional basis, but the inflammatory nature of the letter was also highly relevant to applicant's state of mind during the recorded conversation. Further, any unfair prejudice relating to the possible hearsay or bolstering purposes to which the letter might be accorded could have been ameliorated by a limiting instruction.[44] If an instruction were requested, the trial judge could have instructed the jury not to consider the contents of the letter for the truth of the matters

---

[43] *Id.* at 641-42.

[44] *See Garcia v. State*, 201 S.W.3d 695, 704 (Tex. Crim. App. 2006) (under Rule 403 analysis, limiting instruction diminished potential prejudice flowing from the evidence); *Henderson v. State*, 962 S.W.2d 544, 567 (Tex. Crim. App. 1997) ("whether a limiting instruction would have been effective in preventing the jury from being influenced by the evidence's prejudicial aspects" is a legitimate factor in a Rule 403 analysis).

asserted, nor to consider the contents for the purpose of bolstering the credibility of C.W.'s trial testimony, nor to consider the contents for any other purpose except to show applicant's state of mind during the recorded telephone conversation and to assess the meaning, significance, and credibility of the statements made by applicant during that conversation.

And while the letter contained allegations that were cumulative of what C.W. testified to, the letter itself was a unique piece of evidence because it influenced applicant's statements during the telephone call. In other words, the allegations were cumulative but applicant's *knowledge* of the allegations at the time of the telephone call was not. Finally, we observe that reading the letter to the jury did not take much time. For all of the reasons discussed, we conclude that it would not have been an abuse of discretion to overrule a Rule 403 objection.

### d. Redaction

One possible remedy to reduce prejudice is to redact objectionable portions of a document.[45] As we observed earlier, however, the probative value of the letter flows from its effect on applicant, and the inflammatory portions of the letter are highly probative for that purpose. The trial judge would not have erred in refusing to redact the letter.

### e. Limiting Instruction

When evidence is admissible for a limited purpose, the party against whom the evidence is

---

[45] *See Coronado v. State*, 351 S.W.3d 315, 321 n.30 (Tex. Crim. App. 2011) (repeating suggestion by commentator that some videotapes could be redacted to eliminate testimonial statement to avoid a confrontation problem); *Tucker v. State*, 771 S.W.2d 523, 535 n.6 (Tex. Crim. App. 1988) ("The trial judge should hear the recordings outside the presence of the jury in order to rule on objections to their admissibility, and has the power to delete objectionable portions if necessary."); *Carey v. State*, 455 S.W.2d 217, 223 (Tex. Crim. App. 1970) (referring to redaction as a possible remedy in connection with admitting evidence).

admitted is entitled to a limiting instruction upon request.[46] Because we have assumed, without deciding, that the letter did not satisfy the hearsay exclusion—and therefore was not admissible for its truth or to support C.W.'s credibility—we further assume that applicant was entitled to a limiting instruction in line with what we have discussed above. We will likewise assume, without deciding, that Laird performed deficiently in failing to request a limiting instruction.

### B. Prejudice

Because the letter was admissible for some purposes, defense counsel's conduct did not cause the jurors to hear the contents of a letter that they would not have otherwise heard. The only question is whether there is a reasonable probability that the outcome of the trial would have been different if the jurors had been given a limiting instruction to guide their consideration of the letter.

Applicant essentially had two defensive theories: (1) he did not molest C.W. during the 1991 Houston trip, and (2) he did not molest C.W. at all as a child. In the present case, applicant had an advantage that most persons accused of child molestation do not have. There was only a narrow window in time in which the charged offense could have occurred. The only time C.W. and applicant were together in Houston when C.W. was under the age of fourteen was the weekend they went to Houston in January 1991 for the card show.[47] Weaver's testimony that there was no bed in the upstairs guest room and J.G.'s testimony that C.W. did not leave his sleeping bag would, if believed, tend to refute the claim that applicant molested C.W. during that time. In addition, Laird

---

[46] TEX. R. EVID. 105(a).

[47] If the jury believed that applicant molested C.W. only during the second trip to Houston, in 1993, it could have convicted applicant only of the lesser-included offense of sexual assault because C.W. was fourteen years old at the time. *See* TEX. PENAL CODE §§ 22.011(a)(2), (c)(1), 22.021(a)(1)(B), (a)(2)(B).

supplied the jury with a motive for C.W. to make up the Houston incident: the Dallas conviction was overturned. And J.G.'s testimony that C.W. had a sexual relationship with him before the 1991 Houston trip (which, if true, would mean that the Houston trip was not in fact the site of C.W.'s first sexual experience) suggested the possibility that C.W.'s memory of that trip was faulty.

The letter did not discuss or allude to the 1991 Houston incident. The letter's bolstering effect, if any, was to whether applicant had molested C.W. in general. It was possible for the jury to believe that applicant molested C.W. over the years in Dallas but did not molest C.W. on that Houston trip. If the jury were inclined to so believe, it would not matter whether the letter's allegations were true or whether C.W. was credible, in general, on the point that applicant had molested him during his childhood.

We are not saying that applicant's Houston-specific defense was without serious flaws,[48] but the defense that applicant did not molest C.W. as a child *at all* was, in many respects, a much more difficult one to advance. Applicant had only the general testimony from J.G. that nothing out of the ordinary happened and applicant's denials in the recorded telephone conversation. But J.G.'s testimony and applicant's statements were laced with incriminating evidence. J.G.'s sexual relationship with C.W. at age twelve suggested that one or both boys had been sexually abused by an adult. And although, during the recorded telephone conversation, he denied molesting C.W. as a child, applicant admitted to having sex with C.W. when he was eighteen (barely an adult from a lay perspective) and made a number of statements that strongly suggested, especially in light of

---

[48] J.G. acknowledged that his sexual relationship with C.W. might have begun after the 1991 Houston trip, and the implication that C.W. was motivated to lie about the Houston incident because he was dissatisfied with the outcome of the Dallas trial was rebutted by his reference to the Houston incident in the recorded telephone conversation, which occurred before the Dallas trial. *See* below.

applicant's knowledge of the contents of C.W.'s letter, that applicant's denials were not true.

In any event, with respect to whether applicant molested C.W. in general, the letter did not add much, hearsay or bolstering-wise, to the trial evidence. The substantive facts contained in the letter were elicited elsewhere in the trial. C.W. testified to applicant's sexual abuse, to C.W's resulting depression and problems trusting others, and to the fact that C.W. had told his brothers about the abuse. C.W. recounted that the sexual abuse had happened over an extended period of time in Dallas. Ross, the oldest brother, also testified about C.W.'s outcry to him. Fayteen Marshall testified that C.W. suffered from depression and from anxiety that was "off the chart."

Much of the letter was not factual but was simply an evaluation of what kind of person applicant must be to have done what he did to C.W. Given C.W.'s accusations of child molestation at trial, those evaluative statements—that C.W. regarded applicant as a "pedophile" and a "sick" person, for example—were not news to the jury. The letter also conveyed a tone of emotional distress, but Marshall's testimony about C.W.'s "off the chart" anxiety did so as well. And the jury would understand that the emotional tone of the letter was somewhat artificial because C.W., who was trying to force applicant to break contact with him and his family, testified that he purposefully wrote the letter in as harsh a manner as he could.

Moreover the bolstering significance of the letter is diminished when one considers that the trial was full of evidence of prior consistent statements from a variety of sources: outcries to C.W.'s brothers, to C.W.'s parents, to a doctor, and to a counselor, and statements made by C.W. in the recorded telephone conversation as he was talking to applicant. And at least some of these statements were admissible for the truth of the matters asserted. C.W.'s statements to Marshall, for

example, were admitted under the outcry statute.[49]

For all of these reasons, we conclude that applicant has not demonstrated a reasonable probability that the outcome of the trial would have been different if the trial court had issued a limiting instruction with respect to the letter.

## VI. ISSUE 3: DALLAS TRIAL

Rather than address the issue of deficient performance, we will go straight to the question of prejudice. One path to acquittal in this case—at least of the offense of *aggravated* sexual assault—was to convince the jury that, even though applicant may have molested C.W. over the years, no molestation occurred during the 1991 Houston trip. The defense had testimony from Weaver and J.G. that suggested that a molestation incident could not have happened at that time. Any dissatisfaction harbored by C.W. about the outcome of the Dallas trial could supply a motive to make up an incident in Houston. And to make applicant guilty of *aggravated* sexual assault (instead of the lesser offense of sexual assault), the incident had to have occurred during the first trip, in 1991, when C.W. was twelve years old, rather than the second trip, in 1993, when C.W. was fourteen.[50]

The notion that the Houston incident was made up because the Dallas conviction had been

---

[49] *See* TEX. CODE CRIM. PROC. art. 38.072; *Bratcher v. State*, No. 01-08-00610-CR, 2009 Tex. App. LEXIS 3336, *16-17 (Tex. App.–Houston [1st Dist] May 14, 2009, pet. ref'd) (upholding admission of Marshall's testimony as outcry evidence). In addition, C.W.'s statements to applicant during the recorded telephone conversation that referred to the Houston incident qualified as prior consistent statements under Rule 801(e)(1)(B) because they tended to rebut the claim of recent fabrication arising from Laird's cross-examination suggesting that C.W. was dissatisfied that the Dallas conviction had been overturned.

[50] And by opposing the submission of sexual assault, Laird was attempting to force the jury to decide only whether the 1991 incident had occurred.

overturned was undermined by references to the Houston incident in the recorded telephone call, which occurred before the Dallas trial. But applicant made statements during the recorded conversation that suggested that C.W. was getting the 1991 and 1993 trips mixed up. Consistent with testimony later given by Weaver, applicant stated that everyone slept on the first floor of Weaver's house during the 1991 trip—with applicant and J.W. (*not* C.W.) on a sleeper sofa. So, it was at least possible for the jury to believe that C.W.'s references to the first Houston trip during the recorded conversation were a result of confusion and that C.W. later decided to make up a 1991 Houston incident because of his frustration with the Dallas conviction being overturned. Or it is possible that the jury could believe that C.W.'s later memory of the 1991 incident was false and influenced by his frustration with what happened in Dallas.

And while evidence about the result of the Dallas trial may have been only marginally helpful to applicant's Houston-specific defense, the evidence was only marginally damaging with respect to applicant's general defense that he had *never* molested C.W. The usual prejudice associated with informing a jury about a defendant's prior convictions is that the jurors learn of extraneous offenses. But the jury in the present case had already heard evidence that applicant had committed extraneous offenses in Dallas.

Knowledge that another jury had found applicant guilty of those offenses might have marginally enhanced the credibility of C.W.'s allegations, except that the conviction was overturned, which could have been because of a technicality or could have been a sign that something was wrong with the State's case. The jury was not told the exact reason the verdict was overturned—just that it was a jury-charge problem, which could be any number of things. Habeas counsel has suggested that, if the jurors learned about the conviction and its dismissal, they "would be furious and convict

[applicant] to make things right," but that is speculation, and how a jury perceives an overturned guilty verdict could well depend upon its own assessment of the complaining witness's credibility. And the jury was told that the Dallas offenses could possibly be retried, so it did not need to "make things right." The jury could let the Dallas authorities attend to the Dallas offenses, a point Laird made in his closing argument.

In addition, other factors enhanced C.W.'s credibility. C.W. made multiple outcries and suffered serious emotional problems. Applicant admitted that he had sex with C.W.—the only question was when, with applicant positing the age of eighteen. By his own admission, applicant overlooked inappropriate behavior engaged in by C.W. without informing C.W.'s parents. Applicant kept all of C.W.'s faxes (mementos, the prosecutor would call them), thought of C.W. as his best friend, and said that he had fallen in love with him. And according deference to the trial judge's finding that applicant was not prejudiced, we can infer that C.W. appeared credible on the witness stand. The prosecutor emphasized in closing argument that C.W. had no reason to lie because the allegations C.W. was making were embarrassing, especially to a heterosexual male with a girlfriend.

Moreover, the Dallas jury's guilty verdict was not a finding that applicant committed the *Houston* offense, and the jury in the present case was given limiting instructions regarding both extraneous offenses and prior convictions. In that regard, the jury was instructed that extraneous offenses could be considered for only limited purposes, and while the instruction regarding prior convictions was not a model of clarity, the instruction explicitly provided that a prior conviction could not be considered as evidence of guilt.

And as we have explained in connection with the second issue, contending that applicant had never molested C.W. was, in many ways, much more difficult than merely contending that he did

not molest C.W. during the 1991 Houston trip. That evidence from the Dallas trial may have produced a (marginal) trade-off between applicant's defensive theories in his Houston trial—marginally boosting the Houston-specific theory while marginally damaging the general denial-of-molestation theory—does not establish a reasonable probability that he would not have been convicted.

We conclude that the three filed-and-set grounds are without merit. Concluding that none of applicant's other grounds are meritorious, we deny relief.


Delivered: June 26, 2013
Do not publish